DECISION
"Fairness is what justice really is."
-Justice Potter Stewart[1]
These consolidated administrative appeals are before the Court for decisions. Champlin's Realty Associates ("Champlin's," "Applicant," or "Plaintiff") brings the appeal in PC-06-1659 challenging the denial of its application to Coastal Resources Management Council ("CRMC") to expand its marina.[2] Champlin's, a Rhode Island corporation, operates a marina in the Great Salt Pond in New Shoreham, Rhode Island ("New Shoreham" or "Town"). CRMC was created under Chapter 23, Title 46 of the General Laws of Rhode Island to serve as lead agency for the planning and management of the state's coastal regions. Plaintiff brings its complaint against the members of CRMC, [3] the Town, as well as those who intervened before the administrative agency to oppose the application, the Block Island Land Trust, the Conservation Law Foundation, the Committee for the Great Salt Pond, and the Block Island Conservancy.
Champlin's claims that the decision of CRMC, denying its application, was made upon unlawful procedure; in violation of constitutional or statutory procedure; in excess of the statutory authority of the agency; affected by other error of law; clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; and arbitrary, capricious and characterized by abuse of discretion or clearly unwarranted exercise of discretion, all of which *Page 3 
affected the substantial rights of the Plaintiff.
The Rhode Island Administrative Procedures Act ("RIAPA"), G.L. 1956 § 42-35-15, confers jurisdiction on this Court as to Champlin's appeal. Although administrative appeals are generally determined solely on the record, the Court granted Champlin's request to present evidence of alleged irregularities in the procedure before the agency not shown in the record. See Section 42-35-15(f). Also, while the matter was pending in this Court, the Rhode Island Supreme Court issued two decisions in other cases that impact on the issues in the instant matter. See Arnoldv. Lebel, 941 A.2d 813 (R.I. 2007); In re Request for Advisory Opinionfrom the House of Representatives (Coastal Resources ManagementCouncil), 961 A.2d 930 (R.I. 2008).
The Town of New Shoreham brings an administrative appeal in PC-06-3900 from the failure of CRMC to approve the Harbor Management Plan New Shoreham initially submitted to the Town Council in 1999 and re-submitted as amended in 2003. The Court finds that the Town's reliance on § 42-35-15 is misplaced. Whereas, the Town has standing to oppose Champlin's appeal and would have had standing to bring an administrative appeal as an aggrieved party had CRMC granted Champlin's application, the Town has no standing to bring an appeal under § 42-35-15 for the failure of CRMC to act on its request for approval of their Harbor Management Plan. The mere fact that CRMC consolidated the Town's request with its consideration of Champlin's application does not confer jurisdiction on this Court to review the matter under the RIAPA. Although the parties stipulated to consolidate these appeals, the Court finds that the Town's appeal is not properly before the Court. Accordingly, the Court dismisses the appeal without prejudice.
For the reasons stated below, the Court grants Champlin's appeal and dismisses the appeal of the Town. The Court reverses the decisions of CRMC, denying Plaintiff's motion to *Page 4 
disqualify CRMC chairperson Tikoian and rejecting the recommendation of the CRMC Subcommittee. Champlin's application shall be granted with this Court's affirming of the decision of the members in support of the Subcommittee Recommendation ("Findings of Fact of CRMC Members in Support of the Subcommittee Recommendation").
 I Town of New Shoreham's Appeal, PC 06-3900 A Facts and Travel
The Town of New Shoreham began operating rental moorings in the Great Salt Pond in 1983. On January 7, 1991, the Town Council approved a Harbor Management Plan ("1991 plan") developed by the Town. (Town Exhibit Y at 1.) In accordance with CRMC Guidelines for the Development of Municipal Harbor Management Plans[4] ("Guidelines"), the Town Solicitor was required to certify that the 1991 plan, once approved, was consistent with the Costal Resources Management Program[5] ("CRMP") and forward the plan to the CRMC staff for a consistency review.See Section (IV)(A) of Guidelines. CRMC approved the plan, with additional requirements, for a period of five years on March 12, 1991, and returned it to the Town Council to approve the plan as modified. (Town Exhibit Y at 6.) The Town Council gave final approval of the modified plan on December 12, 1991. (Town Exhibit Y at cover.)
Mooring Field E was one of the mooring fields contained in the 1991 plan. (See Town Ex. Y at App. C.) In order to comply with the configuration called for in the 1991 plan, the Town had to reconfigure Mooring Field E. See id. To accomplish this, the Town obtained a permit from the United States Army Corps of Engineers ("ACOE") in 1993. (See CRMC Ex. 2-11-1.) Concurrent with the ACOE approval to reconfigure the mooring field, the ACOE also *Page 5 
approved an expansion in the number of moorings to one hundred.Id. The 1993 ACOE permit remains in effect to this day. Id.
Five years lapsed from CRMC's approval of the 1991 plan. In 1999, the Town Council adopted a new Harbor Management Plan ("1999 plan") and submitted it to CRMC for consistency approval. (Town Ex. W at 4.) Despite receiving the plan in 1999, CRMC staff did not review it until 2003. (Subcomm. Hr'g. Tr. at 2123.) As a result of the 2003 review of the 1999 plan, CRMC staff suggested a number of changes to the 1999 plan to bring it into compliance with the CRMP. (Subcomm. Hr'g. Tr. at 2135; Town Ex. W at 5.)
Before adopting the suggested changes, on October 10, 2003, while Champlin's application to expand its marina was pending before CRMC, the Town petitioned the agency for a one-year interim approval of the 1999 plan. (Town Ex. W at 1-2.) At its meeting on November 7, 2003, CRMC consolidated its review of Champlin's application with its consideration of the Town's request for approval of its 1999 plan, a decision on which might impact its ruling on the application to expand the marina. (Subcomm. Hr'g. Tr. at 2136-37.)
On November 19, 2003, the Town Council formally adopted the changes recommended by the CRMC staff review, and the Town resubmitted the plan ("2003 plan") to CRMC for further review. On November 21, 2003, CRMC staff, having concluded that the plan was substantially, although not totally, compliant with the CRMP, recommended approval of the 2003 plan on a one-year interim basis so the Town could resolve a number of remaining deficiencies in its application. (Subcomm. Hr'g. Tr. at 2136-37.)
Despite the staff recommendation in favor of the 2003 plan, when the full Council took up the matter at its November 25, 2003 meeting, CRMC approved, on an interim basis, the 1999 plan, rather than the modified 2003 version. Id. However, CRMC did not address the entire *Page 6 
1999 plan and failed to approve the submission as it related to Mooring Field E. The approval was silent as to this mooring field. Id.
Following the November 2003 interim approval, in part, of the 1999 plan, the Town has addressed the deficiencies identified in its 2003 plan and petitioned CRMC for full final approval of the 2003 plan, including Mooring Field E. (Subcomm. Hr'g. Tr. at 2137.)
Based on this procedural history, the Subcommittee Recommendation found that:
 44. Regarding the validity of the Towns HMP, CRMP Section 300.15 requires that all municipalities proposing to adopt harbor rules, regulations, or programs shall apply to the Council for a determination of consisitency with the Coastal Resources Management Program.
 45. Until such time as a comprehensive harbor management (sic) is prepared and approved by the CRMC, all activities regulated throughout the CRMP, or taking placed (sic) below the MHW mark, must come before the CRMC for review and approval in accordance with the program.
 46. The Town's Harbor Management Plan, which was approved in 1991, expired in 1996. The Town did not reapply for a renewal of that plan until at least sometime in 1999. The CRMC does not recognize the validity of the subsequent plan until it is approved by the CRMC." (Subcomm. F.F. 44, 45, 46 at 5, 6.)
The decision of the five members of the full Council, who voted against the Subcommittee Recommendation, reports the same findings in paragraphs 78, 79, and 80, except in paragraph 80, after noting that "The CRMC does not recognize the validity of the subsequent plan until it is approved by the CRMC," the Council continued to find that "However, those CRMC members opposed to the subcommittee recommendation find that the appropriate location and delineation of mooring field E should be that as approved and documented in the 1993 ACOE permit." (Full Council Decision ¶ 80 at 11.) The Court notes that the location and delineation of Mooring Field E, as approved and documented in the 1993 ACOE, permit is that same location and delineation as was approved by CRMC in the 1991 plan and is carried *Page 7 
through, without alteration, in the interim 1999 and 2003 plans. (Town Ex. Y at App. C; CRMC Ex. 5-1-4-1 at App. D.)
The Town brings its appeal to challenge the decision of CRMC, finding that there is no active Harbor Management Plan ("HMP") for Great Salt Pond. In support of its appeal, the Town first argues that the 1991 plan has not expired. In the alternative, the Appellant Town contends that the 1999 plan is valid and legally binding. Finally, the Town asks this Court for an order requiring CRMC to approve the 2003 plan.
 B The Town's Appeal Must Be Dismissed
The Rhode Island General Assembly has provided for two avenues of review for agency action: administrative appeal pursuant to § 42-35-15, and declaratory judgment on the validity or applicability of rules pursuant to § 42-35-7. In order for the Court to exercise jurisdiction over an administrative appeal, the party who seeks to bring the appeal must, after having exhausted all administrative remedies, be "aggrieved by a final order in a contested case." Section 42-35-15(a). Section 42-35-1(3) defines "Contested case" as "a proceeding, including but not restricted to ratemaking, price fixing, and licensing, in which the legal rights, duties, or privileges of a specific party are required by law to be determined by an agency after an opportunity for hearing." "Order" is, in turn, defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive or declaratory in form, of a contested case." Section 42-35-1 (10). In contrast to an order, Section 42-35-1(8) defines "Rule" as:
 each agency statement of general applicability that implements, interprets, or prescribes law or policy or describes the organization, procedure, or practice requirements of any agency. The term includes the amendment or repeal of a prior rule, but does not include: (1) statements concerning only the internal management of an agency and not affecting private rights or procedures *Page 8 
available to the public, or (2) declaratory rulings issued pursuant to § 42-35-8, (3) intra-agency memoranda, or (4) an order.
CRMC consolidated the Town's HMP consistency review and Champlin's application to expand its marina for purposes of administrative convenience. However, when CRMC rendered its decision, it did not address the question of the 2003 plan's consistency with the CRMP. In fact, CRMC made no factual findings or conclusions of law respecting the 2003 plan. The mere fact that the consistency review of the Town's HMP was consolidated for hearing with Champlin's application to expand its marina for purposes of administrative convenience and efficiency does not result in an automatic right for the Town to bring an appeal of that decision without satisfying the criteria laid out in § 42-35-15. Though the CRMC adjudicatory decision denying Champlin's application is a final order in a contested case and, therefore, a proper subject to judicial review under § 42-35-15 of the RIAPA, in order for the Town to bring such an appeal, the Town must first qualify as a aggrieved party. Because the Town fails to even allege injury in fact arising out of the decision and, examining the record, the Court cannot identify one, this Court must dismiss the Town's appeal.
Under the RIAPA, § 42-35-1 et. seq., those seeking judicial review of administrative agency decisions are required to establish standing by meeting two criteria: they must be persons aggrieved by the administrative action taken, and administrative remedies must have been exhausted prior to seeking judicial review. Section 42-35-15. In Rhode Island, in order to determine whether a party is aggrieved, "[t]he question is whether the person whose standing is challenged has alleged an injury in fact . . . if he has, he satisfies the requirement of standing." Rhode Island Ophthalmological Soc. v. Cannon, 113 R.I. 16,26, 317 A.2d 124, 129 (1974). Normally, in order to demonstrate injury in fact, a party must demonstrate that the administrative order will "`adversely affect[ ] in a substantial manner some personal or property right of the *Page 9 
party or impose[ ] upon it some burden or obligation.'" See JohnstonAmbulatory Surgical Associates, Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000) (quoting Liguori v. Aetna Casualty and Surety Co., 119 R.I. 875,880, 384 A.2d 308, 311 (1978)). Nevertheless, the Rhode Island Supreme Court has recognized that standing for "a governmental official, agency, commission, or board charged with the responsibility of administering a particular set of rules and regulations designed to promote the public safety and welfare" is relaxed because such public officials "act[] for the people and, as such, must be permitted to represent the people when a matter of public interest is involved." Renza v. Murray, 525 A.2d 53,56 (R.I. 1987) (quoting Newman-Crosby Steel, Inc. v. Fascio,423 A.2d 1162, 1165 (R.I. 1980)). Further, "[O]ne need not be substantially injured in order to be allowed standing. The line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury." Matunuck Beach Hotel, Inc. v. Sheldon,121 R.I. 386, 396, 399 A.2d 489, 494 (1979). Thus, in order to show injury in fact, government entities entrusted with guardianship of the public interest must demonstrate that "an unfavorable outcome of the controversy will adversely affect the public interest."Matunuck, 121 R.I. at 395, 399 A.2d at 494.
Specifically in the context of CRMC assents, our Supreme Court has declared:
 If the decision of the council to permit construction within a municipality is faulty, that decision of necessity aggrieves that municipality and its citizens. What is of `immediate and potential value to the present and future development of this state' must be of value to that subdivision of the state in which it occurs. If this asset is not protected by the council as the Legislature has mandated it should be, that subdivision has recourse under § 42-35-15. As we have in the past, we note that government may be aggrieved when the public interest is affected. City of East Providence v. Shell Oil Co., 110 R.I. 138, 143, 290 A.2d 915, 918 (1972); Buffi v. Ferri, 106 R.I. 349, 351, 259 A.2d 847, 849 (1969). That the Legislature has designated concern for our coastal resources a matter of great public interest is evident in the legislative findings of s 46-23-1. East Greenwich Yacht Club v. *Page 10 Coastal Resources Management Council, 118 R.I. 559, 376 A.2d 682 (R.I. 1977) (footnotes omitted).
It has, therefore, been long established that local municipalities are permitted to appeal CRMC assents. However, the interest a municipality has in the outcome of a case must still result from the consequences that an adverse decision may bring to the entity's regulatory charge. In other words, to constitute an injury in fact, the governmental entity seeking to assert the injury must be able to point to an actual adverse consequence brought about by the decision. See East Greenwich YachtClub, 118 R.I. at 559, 376 A.2d at 682 (municipalities have standing to appeal a CRMC decision assenting to permit because issuance of the permit would cause injury in fact to the town); see also Matunuck,121 R.I. at 395, 399 A.2d at 494 (municipality had standing to appeal decision that would have allowed for the sale of alcoholic beverages in contravention of the town's comprehensive plan because violation of the comprehensive plan was injury in fact).
Here the Town fails to allege any injury in fact flowing from the decision of CRMC to deny Champlin's application for a marina expansion. In fact, it is the position of the Town that "this Honorable Court should and, respectfully, must affirm that denial." (Town's Brief at 9.) Far from alleging an actual injury in fact, the Town's position argues for the correctness of the Council's decision and forecloses the existence of an actual injury-in-fact stemming from the CRMC's decision and flowing to the Town. Instead of protesting the decision to grant, or not, Champlin's application to expand its Marina, the Town takes issue with the Council's factual findings. In particular, the Town alleges that it
 is aggrieved by certain findings set forth in the written decision of July 5, 2006, in particular but not limited to the finding that:
 80. The Town's Harbor Management Plan, which was approved in 1991, expired in 1996. The Town did not *Page 11 
reapply for a renewal of that plan until at least sometime in 1999. The CRMC does not recognize the validity of the subsequent plan until it is approved by the CRMC. However, those CRMC members opposed to the subcommittee recommendation find that the appropriate location and delineation of mooring field E should be that as approved and documented in the 1993 ACOE permit. (Town's Complaint at 1.) (emphasis added).
That the Town takes issue with the factual findings of CRMC does not confer aggrieved status upon the Town independent of its role as an objector to Champlin's application. As such, this Court concludes that the Town does not qualify as an aggrieved party, and this Court must dismiss its appeal for lack of standing to bring an administrative appeal.
In addition, with respect to the question of the 2003 plan's consistency review, the Court would note that it is apparent that CRMC has yet to render a final decision on that question. While CRMC would have the option to either adopt the HMP through a rule making process or to specifically review the HMP for consistency in an adjudicatory proceeding, neither course has taken place to date. As such, a determination on HMP's approval remains before CRMC. This too weighs in favor of a dismissal of the Town's appeal. The rule that appellate review, with limited exceptions, is limited to final orders in contested cases is consistent with traditional understandings of the appellate function. It serves to ensure efficient allocation of judicial resources by preventing the piecemeal litigation of an action and ease of review by ensuring a complete record exists for the reviewing court to assess.See Industrial National Bank of Providence v. Colt, 101 R.I. 488, 491,224 A.2d 900, 902 (R.I. 1966) ("there has been no relaxing of the principle that litigants may not try their cases piecemeal."); see alsoHenderson v. Henderson, 818 A.2d 669, 671 (R.I. 2003) (dismissing an appeal that sought review of an interlocutory order and proceeding to the merits "only by way of defendant's petition for writ of certiorari."); Sciacca v. Caruso, 769 A.2d 578 (R.I. 2001) (warning that local boards must *Page 12 
provide sufficiently detailed records so that courts can undertake appellate review). Here, while CRMC issued a decision on Champlin's application, a decision on the 2003 plan remains pending regardless of whether or not the matters were consolidated at the agency level. Thus, until such a time as CRMC renders a final decision, in a contested case, on the question of the 2003 plan's consistency with the CRMP, this Court does not have jurisdiction under the RIAPA to hear an appeal of that matter.
Likewise, if CRMC should choose to adopt the 2003 HMP through the rulemaking process, the appropriate channel for review would be to initiate a declaratory judgment action pursuant to § 42-35-7, not through the administrative appeal procedure. Despite the Town's protestations otherwise, the significant delay in CRMC's action on the 2003 plan does not give rise to an issue subject to review under the RIAPA. While at the federal level, § 706(1) of the Administrative Procedures Act, 5 U.S.C. 1001 et. seq. empowers courts to compel "unreasonably delayed agency action," no equivalent Rhode Island statute exists.
Rather, those seeking to compel agency action on a particular application should file a § 42-35-7 action for a declaratory judgment and seek mandamus. Because such a request is not pending before this Court, it shall not address the merits of such an action. The Court, however, would note that given the significant delegation of regulatory powers to CRMC and the HMP program's existence as an object of regulatory, rather than statutory creation, such an application would be faced with the Herculean task of proving that CRMC has a ministerial duty to approve a HMP without the discretion to refuse. See UnionStation Associates v. Rossi, 862 A.2d 185, 193 (R.I. 2004).
Therefore, because the Town fails to allege an injury-in-fact and because no final order or rule has been adopted with respect to the 2003 HMP, this Court dismisses PC 2006-3900 for lack *Page 13 
of standing. However, while the Town did not have standing to pursue an appeal of its own under RIAPA, it has joined in the objection to Champlin's appeal. As such, to the extent CRMC's decision relies on the CRMC's conclusion that the 1991 and 1999 HMPs had expired, those concerns are more appropriately addressed in the context of Champlin's appeal.
 II Champlin's Appeal, PC 06-1659 A Facts and Travel
In 2003, Champlin's filed an application[6] with the CRMC, seeking to expand its existing marina by 240 feet into the Great Salt Pond. In accordance with its statutory responsibility, the CRMC has the authority to grant applications for the expansion of existing marinas. G.L. 1956 § 46-23-6(4)(iii). Specifically, Champlin's sought:
 an expansion that would cover an area of approximately four acres. The expansion would require a change in the approved perimeter limit and increase fixed docks by approximately 2990 feet increasing [its] boating capacity by 140 boats. The docks will be built similarly to [its] present docks with 755 feet of floating docks in between the fixed piers in areas indicated by the plans. (Champlin's CRMC Application Package at 3.)
As part of the application process, Champlin's obtained a Water Quality Certificate from the Rhode Island Department of Environmental Management, certifying that the project would meet the requirements of the State Water Quality Regulations. (Full Council Decision ¶ 41 at 7.)
The Town objected to Champlin's application, as did the aforementioned intervenors. Pursuant to § 46-23-20.1(e), and Sec. 5.3(1) of the CRMC's Management Procedures, [7] CRMC Chairperson Tikoian appointed a Subcommittee to conduct hearings on the contested *Page 14 
application.[8] He appointed Lemont, Sahagian, Ricci, and Zarella to serve on the Subcommittee and selected Lemont as its chair.[9]
For a period of two years, the Subcommittee conducted twenty-three public hearings and considered testimony from a number of lay and expert witnesses. The hearings concluded on September 16, 2005. Thereafter, on October 24, 2005, Lemont, Sahagian, Ricci, and Zarella, the only Subcommittee members who attended all twenty-three hearings, [10]
convened in a so-called public workshop ("workshop") to consider the evidence, make findings of fact, and issue its recommendation[11] to the full Council.
Between September 16, 2005, the end of the hearings, and October 24, 2005, the date the Subcommittee met to formulate its recommendation, CRMC staff member, Danni Goulet, prepared an alternate plan ("Goulet plan") to share with Subcommittee members, but not with the parties. (Tr. at 42, 3/23; Tr. at 119, 3/22; see Ex. Committee M.) This plan's creation and Lemont and Tikoian's failed efforts to have the Subcommittee consider it, as well as their subsequent advocacy in favor of this plan, will be covered later in the decision.
By a three-to-one vote, the Subcommittee majority voted to recommend that the full Council approve the Champlin's application "as modified" to permit an expansion of 170 feet. On January 10, 2006, the Subcommittee issued its written recommendation (hereinafter "Subcommittee Recommendation") with forty-seven separate findings of fact which correspond *Page 15 
to evidence contained in record of the twenty-three Subcommittee hearings. In its Recommendation, the Subcommittee majority acknowledged that "Type 3 Waters permit both marinas and moorings as high priority uses," with the area available for moorings being significantly greater than that for marinas. (Subcommittee Recommendation Findings of Fact (hereinafter Subcomm. F.F.) 24 at 4; see Subcomm. Hr'g Tr. at 429, 3/3/04.) Furthermore, "all parties to the proceedings" acknowledged the demand for additional marina space in the GSP [Great Salt Pond] and that there has not been an expansion of marinas in the area for some time. (Subcomm. F.F. 25 at 3; see Subcomm. Hr'g Tr. at 155-56, 2/4/04; Subcomm. Hr'g Tr. at 2621, 7/26/05; Subcomm. Hr'g Tr. at 833, 4/28/04.) The Subcommittee identified the factors that CRMC must weigh when considering such proposals, to wit: that Type 3 Waters and the adjacent shoreline are utilized intensely for the needs of the recreational boating public and also retain numerous natural assets of special concern to the Council. (Subcomm. F.F. 14 at 2-3; workshop Tr. at 3143, 10/24/05.)
In weighing the evidence before it, the Subcommittee noted that the CRMC staff engineer and staff biologist recommended that the application be denied as filed because expansion would have a negative impact on natural resources. (Subcomm. F.F. 6 at 2; Subcomm. Hr'g Tr. at 1446, 1/31/05; Subcomm. Hr'g Tr. at 1343, 1/4/05.) In rejecting such testimony, the Subcommittee majority found that it "was impeached upon cross examination." (Subcomm. F.F. 27 at 4; see Subcomm. Hr'g Tr. at 1294-95, 12/7/04; Subcomm. Hr'g Tr. at 1415, 1/4/05; Subcomm. Hr'g Tr. at 1756, 5/18/05.) They instead determined that Champlin's evidence, including its DEM Water Quality Certificate, demonstrated that a marina expansion would not negatively impact finfish, shell fish, or submerged aquatic vegetation. (Subcomm. F.F. 26 at 4; see Subcomm. Hr'g Tr. at 525, 3/24/04; Subcomm Hr'g Tr. at 1020, 6/11/04.) The *Page 16 
Subcommittee majority further found that the evidence presented, along with pump outs which would be installed, and the DEM Water Quality Certificate, ensured that there would be no negative impact on the Great Salt Pond's water quality. (Subcomm. F.F. 28 at 4; see Subcomm. Hr'g Tr. at 2784, 7/25/05.) Regarding the Objectors, the Subcommittee majority rejected their contention that no expansion was acceptable after one of the Objectors' experts stated that a 200-foot expansion would be a viable plan. (Subcomm. F.F. 31 at 4; see Subcomm. Hr'g Tr. at 2494, 6/29/05; see also Subcomm. Hr'g Tr. at 1071, 6/11/04.) The Subcommittee then determined that 365 feet existed between the existing dock and existing moorings. (Subcomm. F.F. 32 at 4; workshop Tr. at 3105, 3113, 10/24/05.) Accounting for the 100-foot buffer zone required by the Town's HMP, the Subcommittee majority noted that the 265 feet available for expansion was sufficient room to accommodate expansion of the marina and the needs of the Town's mooring field. (Subcomm. F.F. 33 at 4;see Subcomm. Hr'g Tr. at 2407, 2497, 6/29/05.) The Subcommittee majority found that expansion would not have a negative impact on the Great Salt Pond's ecology, water quality, and navigability. They also determined that it would not have a negative scenic or aesthetic impact, given the existing uses of the Great Salt Pond. (Subcomm. F.F. 38 at 5;see Subcomm. Hr'g Tr. at 452, 3/3/04; Subcomm. Hr'g Tr. at 470, 3/24/04.) Overall, the Subcommittee majority found that "no reasonable alternatives to Champlin's application were offered by the Objectors." (Subcomm. F.F. 42 at 5; see Subcomm. Hr'g Tr. at 2441, 2467, 6/29/05.)
In concluding, the Subcommittee found that as the Town's 1991 plan had expired in 1996 and no subsequent plan had been approved by CRMC, (Subcomm. F.F. 46 at 5-6;. see Subcomm Hr'g Tr. at 2132, 6/7/05), a comprehensive harbor management proposal was required to come *Page 17 
before the CRMC for review and approval in accordance with the CRMC program.[12] (Subcomm. F.F. 45 at 5; see Subcomm. Hr'g Tr. at 2157-59, 6/7/05.) The majority ultimately recommended that:
 [T]he Full Council [should] approve a seaward expansion of the docks 170 feet with a 25 foot marina perimeter limit on the seaward side of that construction. On the sides of the facility the [marina perimeter limit] will be limited to ten feet. The subcommittee recommends denial of any new construction to the west. The [marina perimeter limit] expansion would total 195 feet seaward and be approximately an additional 3.08 acres increase into the GSP. . . . (Subcommittee Recommendation at 6.)[13]
Lemont dissented. Id. at 7. At the workshop, he had advocated an alternate proposal consistent with the one contained in the Goulet plan, which called for a 100-foot expansion to the west. (Workshop Tr. at 3120-24, 3179, 10/24/05.)
After review of the Subcommittee hearing transcripts, this Court is satisfied that the Subcommittee Recommendation and its findings of fact are supported by the evidence of record.
Several months later, on February 28, 2006, the full Council met pursuant to § 46-23-20.4(a) and Sec. 5.3(2) and 5.3(3) of its Management Procedures to consider the Subcommittee Recommendation.[14] Only those Council members who have read the entire subcommittee record may participate in the meeting of the full Council to consider the subcommittee's recommendation. CRMC Management Procedures § 5.3(3). In accordance with the statutory scheme, the full Council has the discretion to adopt, modify or reject the recommendation *Page 18 
findings of fact and the conclusions of law so long as they set forth in writing the rationale for modifying or rejecting the proposed findings of fact or conclusions of law. Section 46-23-20.4(a). CRMC Management Procedures § 5.3(2).
Prior to the meeting of the full Council, Champlin's filed motions to disqualify Tikoian and Abedon from voting on the Subcommittee Recommendation.[15] At the meeting, before addressing the Subcommittee Recommendation, CRMC addressed the motions to disqualify and denied them. Thereafter, CRMC members discussed the Subcommittee Recommendation. (Full Council Tr. at 52-96, 2/28/06)
Lemont made comments at the full Council meeting that seemingly invoked the Goulet plan:
 As to the issue of the alternative . . . I think the numbers that were presented by Dan [Goulet] on our part were absolutely much more acceptable, and I found that the solution to the problem, rather than expanding out into the pond, was to go to the west, and indeed, part of my recommendation, I believe it was in the subcommittee meeting, was exactly that, expand to the west. Dredge, there was a place to take the spoils. The depth could have been increased. It made, to me, a heck of a lot more sense to reconfigure and utilize that western portion than to go into the uncharted water. And, indeed, many of the things in this subcommittee report I agree with. Yes, there were needs for additional piers in the State of Rhode Island. I have a boat. I know about them. But, the answer was, how much expansion should there have been? What is big enough? What is too big? And, it was very difficult to put that answer and quantify it. That's where we had to utilize the opinions, we had to rest upon the testimony. And, I concluded, Mr. Zarrella, and I think it was done quite well, that the marina could be expanded to the west, that it would suit the need for additional spots that did not interfere further out into the pond that would have an impact on a mooring field, it would have an impact on the fairway and have an impact on safety of all the vehicles through that one area. (Full Council Tr. at 107-09, 2/28/06.)
Later at the full Council meeting, Lemont spoke more about his Subcommittee recommendation: *Page 19 
 [A]nd, when all was said and done with this process, I really thought, based upon the evidence, based upon everything you've heard, based upon the islanders, based upon the islanders that we've talked to, based upon all of the evidence, based upon the legal requirements, what is the right thing to do, because oftentimes I get to that point in decision making, what is the right thing, and I think here I concluded, as this process went on, that the expansion that was being sought was not justified, that there were other ways of skinning that cat.
 I disagree with Mr. Zarrella on the issue of going to the west. It was my recommendation to the subcommittee, which was voted three-to-one, that we go to the west, that, indeed, the area to be dredged, that the rockpile that was there be submerged. I also supported a limited increase out into the pond, based upon the evidence, because I didn't think, and I don't think to this very moment, that no increase is justified. I think if one were to sit through and filter through everything, that it would be fairly easy to conclude that there is something justifiable, but it's absolutely not what the applicant sought. (Full Council Tr. at 188-89, 2/28/06.)
At the meeting, Gray revealed that he had consulted a CRMC staff member off the record on a matter unrelated to the Goulet plan:
 Okay. So, really, the distance that we have here to work with is from the end of the existing pier to the edge of that mooring field?
 Taking that assumption, I asked staff to take a measurement of one of the big plans from the applicant and to measure that out for me, scale it off on the north end of the pier and on the south end of the pier, and the information I got back was that on the north end of the pier there was 340 feet. . . . (Full Council Tr. at 112, 2/28/06.)
Tikoian then requested that Ken Anderson, a CRMC engineer, present the measurement to the full Council:
 Anderson: Yes, Mr. chairperson. Based on Applicant's Number 18 full exhibit, the plan scales off from the T-head, is what Mr. Gray said, is 310 feet to a maximum of 340 feet from the dock T-head to the trapezoidal mooring field.
 Tikoian: And in number 32 it says 365. Is that right, Neill? Gray: That's correct, that's correct. (Full Council Tr. at 121-22, 2/28/06.) *Page 20 
CRMC member Abedon briefly mentioned his similar use of the CRMC staff:
 The numbers that are involved in this case kind of made my head spin. When it comes to mathematics, it's static in the attic. But, I work [sic] with the staff in a limited process, and started to weigh through the same stuff Neill [Gray] did, and I have to come to the same conclusion, that one of real problems is there is navigational problems, particularly with the size of the boats, and I already expressed this before, that it may be a question of the size of the boats. If you want to have more access for more boaters and average size of boats is not 165 feet, maybe it's 38, but if it's a lot smaller, you can get a lot more boats in that area if you wanted to. (Full Council Tr. at 186, 2/28/06.)
CRMC member Sullivan, who is also the Director of DEM, admitted that he had consulted his staff at DEM, off the record, and had not read the entire Subcommittee record, as mandated by Sec. 5.3(3) of the CRMC Management Procedures, having skipped over the "I object" statements:
 I respect all the efforts that have gone into this. I'm not sure if it would be more or less painful to have sat through the hours of oral presentation. I will admit to that I began to skip some of the sections where it said initially I object, and I skipped that. But, I have spent considerable time in the last few months, I have challenged many of my staff to read sections of it, to debate, to discuss, to see if we came up with conclusions, and I must conclude that the public trust is not served by the application before us, it has the potential to diminish the public resource, and I could not be party to support a diminishment of a public resource. (Full Council Tr. at 185, 2/28/06.)
During the meeting, Zarrella expressed his frustration with and hostility toward the Town:
 [I] got a little local knowledge, and one of the things that, I want to use my local knowledge of the island, and I'll say that here, is the island has a tendency to say no. They don't understand compromise." (Full Council Tr. at 160, 2/28/06.)
 The town is going to take some type of responsibility here, and I don't mean the lawyers, I mean the town fathers there. This thing *Page 21 
should have never came to this point. But, every time the Town tries to come up with no, they lose, and they get something taken away from them. (Full Council Tr. at 162, 2/28/06.)
 But, when [the Town] stood up and said, the town's official position is [no extension]. I said, there they go again. I said, you can change the faces, you can check change [sic] the [Town] Council, but you can't change the attitude. Block Island take responsibility yourself. (Full Council Tr. at 165, 2/28/06.)
Following the contentious meeting, a motion was made and seconded to approve the Subcommittee Recommendation. (Full Council Tr. at 197, 2/28/06.) Zarrella, Shekarchi, Sahagian, Coia, and Ricci voted in the affirmative. Gray, Sullivan, Abedon, Lemont, and Tikoian voted in the negative, resulting in a tie vote. (Full Council Tr. at 200-01, 2/28/06). The CRMC determined that a tie vote resulted in a rejection of the Subcommittee Recommendation. (Full Council Tr. at 198-99, 2/28/06.)[16]
On July 5, 2006, the full Council, through its members voting against the Subcommittee Recommendation, issued a written decision denying the Champlin's application and rejecting the Subcommittee Recommendation. (Full Council Decision at 12.) In anticipation of this written decision, Champlin's took its appeal. Also on July 5, 2006, the CRMC members voting in favor of the Subcommittee Recommendation issued a written recommendation mirroring the findings of fact and recommendation issued by the Subcommittee. (Findings of Fact of the CRMC Members in Support of the Subcommittee Recommendation at 2-7.)
The full Council's decision rejecting the Subcommittee Recommendation seemingly references the Goulet plan when it mentions alternative expansion to the west:
 The evidence is clear that a more efficient utilization of existing facilities is available to the applicant as well as viable alternatives to expand to the west, which outweighs the potential negative impacts associated with a seaward expansion encompassing *Page 22 
approximately 3.08 acres. (Full Council Decision ¶ 38 at 6-7.)
 Regarding the subcommittee majority's finding as to the value of the CRMC staff's reports and testimony, those CRMC members opposed to the subcommittee recommendation do not believe that the CRMC staff's testimony and reports should be entirely discredited. Many of the points made by the staff are valid, particularly relating to the use of alternative designs, more efficient utilization of the existing facilities and area, and the costs for dredging and expansion to the west. (Full Council Decision ¶ 39 at 7.)
 The area of the [Great Salt Pond] between the shoreline and the western most extent of the existing docks could be more efficiently utilized for the construction of docks and operation of a marina. (Full Council Decision ¶ 66 at 10.)
 The evidence demonstrates that while expansion to the west may not be able to accommodate vessels of 165-feet, the credible evidence demonstrates that it would be able to accommodate more average size yachts which are more likely to be used by the Rhode Island boating public. (Full Council Decision ¶ 67 at 10.)
Additionally, the full Council decision relied on the measurements that Gray had originally obtained by consulting CRMC staff off the record:
 The evidence demonstrates that the distance from the edge of the existing facility is between 310-to 340-feet from the edge of the trapezoid shape identified as the Town of New Shoreham's mooring field in the US Army Corp. of Engineers ("ACOE") permit. (Full Council Decision ¶ 51 at 8.)
 Consequently, the appropriate distance to use in assessing navigational impacts is the 310-foot distance to the mooring field. (Full Council Decision ¶ 52 at 8.)
 Therefore, applying appropriate and proper marine design criteria under the existing situation with a 165-foot vessel utilizing Champlin's facility an appropriate channel would be as much as 330-feet, which is more than the 310-feet available under the current configuration. (Full Council Decision ¶ 54 at 8.)
By rejecting the Subcommittee Recommendation on a tie vote, CRMC denied Champlin's application in its entirety, leading to the instant appeal. In count one of its *Page 23 
complaint, Champlin's avers that that the decision of CRMC, denying its application, was made upon unlawful procedure; in violation of constitutional or statutory procedure; in excess of the statutory authority of the agency; affected by other error of law; was clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; and was arbitrary, capricious and characterized by abuse of discretion or clearly unwarranted exercise of discretion, all of which affected the substantial rights of the Plaintiff. (Compl. ¶ 46.)[17] In its second count, Champlin's alleges that its rights to procedural and substantive due process under the United States Constitution, the Rhode Island Constitution, and the Management Practices of the CRMC were violated. Specifically, Champlin's asserts that Tikoian and Abedon, despite having publicly expressed disapproval of the Subcommittee Recommendation in violation of their duty to be fair and impartial, refused to disqualify themselves from voting on Champlin's application. (Compl. ¶ 57.) Lastly, in its third count, Champlin's contends that pursuant to an objective standard of impartiality, Tikoian and Abedon should have recused themselves from consideration of Champlin's application. (Compl. ¶ 62-63.) For relief, Champlin's requests that this Court declare the vote of the CRMC on 2/28/06 null and void, remand this cause to the CRMC with directions to approve the recommendation of the Subcommittee, and order Tikoian and Abedon to refrain from any further participation in Champlin's application. (Compl. ¶¶ 47, 57, 63.)
 1 Section 42-35-15(f) Evidentiary Hearing
After filing its Complaint in this Court, Champlin's filed a Motion for an Evidentiary Hearing pursuant to § 42-35-15(f), requesting that the Court conduct an evidentiary hearing examining irregularities in procedure before the CRMC. (Plaintiff's Mot. For an Evidentiary *Page 24 
Hearing.) In a separate decision, the Court granted the motion.Champlin's Realty Assoc. v. Michael Tikoian et al., PC. 06-1659, January 8, 2007, (Bench Decision); Champlin's Realty Assoc. v. Michael Tikoianet al., PC. 06-1659, January 16, 2007, (Order).
This Court began hearing evidence as part of the evidentiary hearing on March 19, 2007. The evidentiary hearing consisted of sixteen hearing dates, concluding on April 13, 2007.
Pursuant to § 42-35-15(f), the Court, sitting as fact finder, conducted an evidentiary hearing to investigate alleged irregularities at CRMC. The Court does not make credibility findings as to the evidence presented before the agency, in this case, the Subcommittee. However, the Court does determine credibility as to the evidence presented in the Superior Court on the issue of alleged irregularities in the proceedings before the agency that are not evident from the record.
Based upon the credible evidence presented in this Court at the evidentiary hearing, it is clear that CRMC members did not limit their activity on the application to the hearing or meeting rooms. Council members did not appreciate the quasi-judicial nature of their roles or the prohibition against ex parte communications. While the case was unfolding at the Subcommittee hearings, another case was being made in support of or against Champlin's application outside the hearing process and in violation of the letter and spirit of the applicable statutes.
Both Chairperson Tikoian and Subcommittee Chair Lemont opposed the application and made no secret about their feelings. They misinterpreted their role as impartial quasi-judicial officers and spoke freely about their misgivings with the application and later with the Subcommittee Recommendation. Their combined efforts to defeat the application and the Subcommittee Recommendation involved lobbying other members individually, speaking to the media, and communicating with the Governor and his staff. After the hearings ended, but before *Page 25 
the Subcommittee workshop was convened, they directed staff to create an alternate plan, which was prepared by a staff member, Goulet, who himself went outside the record to develop it. (Tr. at 111, 3/22; Tr. at 15-16, 3/23; Tr. at 97-99, 102, 3/26; Tr. at 92, 4/2.) The Goulet plan was shared by Tikoian and Lemont with selected individuals, but not with the parties or intervenors. They were never given an opportunity to confront or cross examine Goulet about his proposal.
The Court accepts as credible the testimony and evidence presented in court that Tikoian misconceived his role as Council chairperson as empowering him to influence the recommendation of the Subcommittee members. In a November 29, 2004 article appearing in The ProvidenceJournal, Tikoian told reporter Peter Lord that he suggested a compromisea year ago and planned to reiterate his position with the Subcommittee. (Ex. 2.) (emphasis added).[18] Additionally, Zarrella testified, "[Tikoian] said after [the Subcommittee hearings conclude] . . . we'll get together and I'll let you know how I want you guys to handle this. . . . That was probably about maybe about three months into the hearing." (Tr. at 40, 3/19.)[19] Zarrella testified further that towards the conclusion of the hearing process, Tikoian made similar comments at the National Hotel on Block Island, "[Tikoian] said he was trying to try to get [the Subcommittee hearings] wrapped up as quick as he could and he was going to get together with us and tell us how to vote." (Tr. at 41, 3/19.) Sahagian echoed Zarrella's testimony, recalling that Tikoian indicated at the National Hotel that when the time came for the Subcommittee to vote, Tikoian would have a plan drawn up for the Subcommittee members to vote on. (Tr. at 72, 4/11; Tr. at 5-6, 4/12.) The Court notes that Ricci, who was also present at the Hotel, denied hearing Tikoian speak these words. (Tr. at 39, 3/20.) For his part, Tikoian denied telling Zarrella that he was *Page 26 
going to tell him how to vote. (Tr. at 133-34, 4/9/07.) Tikoian claimed that he did not mention a single thing about Champlin's at the National Hotel and denied that Zarrella was even present. (Tr. at 93-94, 4/5; Tr. at 134, 4/9/07.)
When the Court considers all of the facts and circumstances presented at the hearing, the Court rejects Tikoian's testimony that he never attempted to interfere with the independence of the Subcommittee. On this point, the Court accepts the testimony of Zarella and Sahagian as more reliable accounts of the incident. Although Ricci was a credible witness, the Court cannot reject believable testimony merely because one person present did not hear everything that was said that day. The Court also accepts Sahagian's testimony about a phone call he had with Tikoian after a July Subcommittee meeting, in which Tikoian again promised to have a plan drawn up for the members of the Subcommittee. (Tr. at 87, 4/11; Tr. at 3-4, 4/12.)
The Court is satisfied that the record is devoid of any evidence that Governor Carcieri lobbied Tikoian or any other CRMC member on the issue of Champlin's application with the intent to influence their votes. However, the Court finds that Tikoian utterly failed to appreciate his quasi-judicial position and perceived his role, at least in part, as serving the Governor's interests. Throughout the period that Champlin's application was before CRMC, Chairperson Tikoian served as CRMC's liaison to the Governor's office. He engaged in email communications with Mark Adelman, a member of Governor Carcieri's staff. When Tikoian told Adelman that he had to be cautious because CRMC is quasi-judicial, he acquiesced without further protest to Adelman's demands that he provide the Governor with information on the parties involved and their respective positions. (Ex. 3-A; Tr. at 117, 3/20.) Rather than distance himself from the political process and have Grover Fugate, Executive Director of CRMC, serve as point person with the Governor's office, Tikoian continued to communicate with Adelman *Page 27 
and later met with the Governor himself. The Court accepts Adelman's testimony that from November 9, 2004 through the final decision of the CRMC, Tikoian was his point person or liaison with CRMC. (Tr. at 75, 77-78, 3/20.) The Court finds that Tikoian sought the Governor's input and approval of the direction he was taking in reference to the Subcommittee Recommendation. It was incumbent on Tikoian to distance himself from outside influences and to recognize that his responsibility was to the public to ensure the fairness of the application process. He failed to do so.
Tikoian testified that during the Subcommittee hearings, he was unable to accompany the Governor on a dredge tour and asked Lemont to attend in his absence. He asked Lemont to discuss the status of Champlin's application with Governor Carcieri although he denied telling Lemont to address the merits of the proposal with the Governor. (Tr. at 40, 4/5.) Lemont testified that he spoke to the Governor as requested. (Tr. at 69, 4/12.) Lemont remembered telling the Governor the number of hearings that the Subcommittee had already conducted and informing him that CRMC had received hundreds of letters regarding Champlin's application. (Tr. at 70, 4/13.) Lemont further testified that after updating the Governor on the status of Champlin's, he reported to Tikoian that he had given the Governor a "quick rundown." (Tr. at 75, 4/13.)
Lemont and Tikoian also worked together to obtain a compromise plan to present to the Subcommittee after the hearings were concluded. At Lemont's direction, Fugate asked Goulet to draft an alternate plan. (Tr. at 95-96, 3/26.) Lemont claims that he requested the plan after one of the Town's witnesses testified that he or she "could live with a 100-foot increase." (Tr. at 87, 4/13; see also Tr. at 70, 4/12.) Lemont testified that although he did not favor any expansion initially, he later decided to support a compromise to get the matter resolved.Id. Lemont *Page 28 
acknowledged that he was being influenced by matters outside the record. He testified that he "saw all of the cumulative things that were going on, the editorials, et cetera, et cetera, I came up with the thought that perhaps we could compromise this, that everybody could get something, and the matter would be resolved." (Tr. at 87, 4/13. Seealso Tr. at 70, 4/12.)
The role of a subcommittee chairperson is akin to that of jury foreperson. Neither the subcommittee chair nor the jury foreperson serves as "super" members of the panel. Each has but one vote. Lemont testified that
 I came up with a compromise that I thought would solve the problem, and that's what I wanted to do. I was chairman of the subcommittee. I had heard the testimony. I had heard the comments of the subcommittee. I was looking for something that would be a compromise. There were many people that I heard on Block Island that wanted no expansion. There were later, some of the letters that I did look at, no expansion. I read the editorial in the Block Island paper, the letters to the editor. I listened to your witnesses. I listened to all of the witnesses. And I came up with a conclusion that perhaps there might be a compromise that would settle this matter. (Tr. at 84, 4/13.)
Approximately two to three weeks before the Subcommittee vote, Goulet testified that Fugate asked him to prepare an alternate plan. (Tr. at 109, 111, 3/22.) Goulet's plan provided a 100-foot extension alternative utilizing area to the west of the existing marina. (Tr. at 42, 3/23;see Ex. Committee M.) Goulet stated, "[The end result] was a synopsis of the information[20] that was in the record as well as a depiction of what I thought a viable alternative would be that allowed expansion and also answered the question of how the Town's mooring field would be designed." (Tr. at 119, 3/22.)[21] *Page 29 
Goulet testified that in preparing his plan, he reviewed more than the record of the proceedings before the Subcommittee. He spoke to a staff member of Rhode Island Department of Environmental Management (DEM) to discuss water quality issues and visited DEM offices, where he reviewed a spreadsheet that was not part of the record. (Tr. at 111, 3/22; Tr. at 15-16, 3/23.) Goulet explained that he relied on the model introduced to him at DEM to determine whether Champlin's applied-for area passed water quality certificate analysis. (Tr. at 102, 3/26.) Goulet also conducted independent research in an effort to find material that would either corroborate or contradict the testimony of the expert witness presented at the Subcommittee hearings. (Tr. at 97-98, 3/26.) Goulet relied on his own professional judgment to draft the Goulet plan. (Tr. at 99, 3/26.)[22] Fugate testified that CRMC staff contacted the Army Corps of Engineers, and Goulet also incorporated their input into his plan. (Tr. at 92, 4/2.)
When the Goulet plan was completed, Goulet was instructed to share it with selected individuals designated by Lemont, including Ricci and Sahagian, but not with Zarrella. (Tr. at 75, 4/12.) Lemont explained his reasoning:
 I considered [Zarrella] to be a loose cannon. He was a person who had trouble not talking. He talked a mile a minute and I just felt he would take this and run to the press or run somewhere with it so what we wanted to do was to show him at the very end so he wouldn't have a lot of time with it. (Tr. at 75-76, 4/12.)[23]
The Court finds that Tikoian was actively involved along with Lemont in the decision to have staff create an alternate plan regardless of whether Lemont was the point person with CRMC staff on the plan. The Court is mindful of Tikoian's expanded view of his role as Council *Page 30 
Chairperson and his communications with other Council members concerning an alternate plan. Fugate testified: "I told Mr. Tikoian, when we originally started to do this, that it was being developed, and then I don't know if it was Mr. Lemont that informed Mr. Tikoian, but Mr. Tikoian was aware that we had completed our work and we had an alternative." (Tr. at 79, 4/2.) The Court draws the reasonable inference from the established facts that the Goulet plan was developed as a joint decision of both Tikoian and Lemont.
As the CRMC staffers showed the Goulet plan to Ricci and Sahagian, Chairperson Tikoian lobbied the Subcommittee members to support it. Ricci testified that he encountered the Goulet plan after the last Subcommittee hearing but prior to the Subcommittee vote. (Tr. at 47, 4/11.) He recalled that Tikoian stopped by his law office and said he thought a modified, 100-foot plan would be best. (Tr. at 34, 3/20.)[24] Ricci recounted, "At the time he indicated to me that if I would agree to support a one-hundred foot plan, the other Subcommittee member, Jerry Sahagian, would also agree to the one-hundred foot modification." (Tr. at 34, 3/20.) Ricci testified that he agreed to give the Goulet plan consideration but could not commit to voting for it. (Tr. at 35, 3/20; Tr. at 58, 4/11.) Goulet testified that he showed Ricci the plan the week before the Subcommittee vote. (Tr. at 30, 37, 3/23; see also Tr. at 115, 3/26.)
After showing the Goulet plan to Ricci, Fugate invited Sahagian to the CRMC office in
Wakefield, Rhode Island to view it. (Tr. at 73, 4/11; Tr. at 13, 4/9/07.) Sahagian testified that he was troubled by their presentation:
 [D]an Goulet opened the plan. I said okay, how far out is the extension? Dan looked down and said 100 feet. I said Grover, I've asked important questions on the record. I even made a statement in July. Don't forget this was in September, only two *Page 31 
months later. I made a statement in July. The owner's [sic] engineer said 205 feet was viable. DEM gave a water quality certificate for a 240-foot expansion. I said why vote on a 100-foot expansion if the state addressed the biological issue which was a 240 expansion? The objector's own expert said 200 or 205 was viable. I've asked questions on the record and indicated on the record that I was leaning towards 200 feet. Why would I accept a 100-foot?
 . . .
 So I said, Grover, what are we doing? He shrugged his shoulders then when I said, can I take a copy of this plan, he said no.[25] Then I left abruptly because I felt that it was way off base, the size and scope of the plan and that if I couldn't take it with me after sitting through 23 long hearings, it was a slap in my face. (Tr. at 96-97, 4/11.)
Tikoian urged Sahagian to support the Goulet plan. The Court accepts as credible Sahagian's testimony that Tikoian called him inviting Sahagian to his home. (Tr. at 76, 4/11.) Sahagian described their October 23, 2005 meeting wherein Tikoian asked him to support the plan:
 I said, Mike, I really don't want to — you're not going to like my answer so please don't ask me. He said come on, I want to talk to you. Do the right thing. I said, Mike, you know, we went back and forth. I said, Mike, don't ask me to vote for that 100-foot plan because you won't like my answer. He asked me did the Speaker of the House call you? I said no and then he went through a whole list of people and asked me if they had called me and I didn't give him any answers. I just said, Mike, come on. We have a friendship, don't let this one disagreement sever our relationship. I shook his hand and I left. (Tr. at 77, 4/11.)
Tikoian, claiming that this meeting with Sahagian occurred on October 15, 2005, asserted that Sahagian told him that Sahagian, Ricci, Sullivan, and Coia had been directed by Speaker of the House's staff on how to vote on the Champlin's application. (Tr. at 96, 4/5.) Additionally, Tikoian testified that following this meeting with Sahagian, Ricci told him that the Speaker of *Page 32 
the House had called him, and Ricci was committed to the Speaker because the Speaker had obtained a job for Ricci's family member. (Tr. at 107, 4/5.) Ricci categorically denied this allegation and further denied that the Speaker ever obtained a job for any of his family members. (Tr. at 42, 4/11.) Ricci denied that he ever had any direct or indirect contact with the Speaker about the Champlin's application. (Tr. at 49-51, 53-54, 4/11.) The Court accepts Ricci's testimony and rejects Tikoian's testimony as lacking credibility and without any factual basis.
Zarrella testified that although he was not shown the plan, Tikoian called his office and advised him of its existence before the workshop. (Tr. at 44, 3/19.) Tikoian denied discussing the Goulet plan with Zarrella prior to the Subcommittee vote. (Tr. at 15, 4/5.) The Court accepts Zarella's recollection of these events as more credible than Tikoian's. Regardless of whether Tikoian and Lemont decided against showing the plan to Zarella until the very end, they clearly told him about its existence.
According to Zarella, Tikoian told him that Sahagian "was not on board" and was supporting a 200-foot expansion. "He told me Tom Ricci — he talked to Tom. Tom was voting for it and Paul [Lemont] was voting for it and he wanted me to vote for it." (Tr. at 44, 3/19.) Zarrella further testified that Tikoian said that Sahagian was putting the agency at risk, and he was going to the Governor's office to have Sahagian removed. (Tr. at 44, 3/19.) Tikoian denied telling Zarrella that Sahagian was putting the agency at risk and that he was going to go to the Governor's office to ensure that Sahagian was not reappointed. (Tr. at 17, 4/5.)[26] Zarella's version of events is more credible than Tikoian's. It is also consistent with Fugate's testimony that Tikoian asked him for information on expiration of CRMC members' terms. *Page 33 
Zarrella further testified that he spoke with Lemont, who also tried to obtain Zarrella's support for the Goulet plan. (Tr. at 45-46, 3/19.) Zarrella testified that he was lobbied on the night of October 23, 2005. (Tr. at 61, 3/19.) Although he did not identify Tikoian as the person who called him, the Court finds that the credible evidence suggests that Tikoian was the person who contacted Zarella that evening.
When Zarrella, Sahagian, and Ricci arrived for the workshop, they learned that Lemont intended to have Goulet offer his plan to the Subcommittee. Zarella testified: "We were angry about the telephone calls that we got the night before and we understood as we walked into auditorium Mike [Tikoian] told us there was going to be some slides that were going to be introduced." (Tr. at 61, 3/19.) Zarella again testified: "we didn't like getting telephone calls the night before, and as we walked in Mike told us that there was going to be slides that were going to be entered in." Id. The Court finds that the only persons who were motivated to lobby members of the Subcommittee on the evening before the workshop were Tikoian and Lemont. Although Zarrella did not specifically identify which of the two members contacted him, the Court reasonably infers from the record it was one of them. Regarding these slides, Zarrella ultimately testified that
 We told Brian Goldman that we didn't want to see those slides and we didn't want any new plans submitted and then Jerry Sahagian talked to Chairman Lemont. We all talked to Chairman Lemont and voiced our opinions that as far as we were concerned the evidentiary hearing was closed. (Tr. at 61-62, 3/19.)
Clearly, Zarrella and Sahagian objected to the presentation of the slides and told Lemont and CRMC Attorney Brian Goldman that they would walk out if the plan was presented. (Tr. at 50, 59-64, 3/19; Tr. at 28-29, 4/12; Tr. at 81, 4/12; Tr. at 84, 4/2.) Lemont relented.
Although they succeeded in preventing Goulet from presenting slides depicting his plan, *Page 34 
his plan was presented indirectly through Lemont. At the workshop, the Subcommittee Chair advocated a compromise that was clearly based upon the Goulet plan. Like the Goulet plan, Lemont suggested a 100-foot seawall plan and spoke of expansion to the west. (Workshop Tr. at 3120-24, 3179, 10/24/05.) Lemont said at the workshop:
 I believe that with the proper excavation and disposal, that a hole could be created right there where the rocks could be rolled into and we could provide more than adequate depth for expansion to the west. As to the outward into the pond, I do not support anything more than 100 feet for a very limited area, and that very limited area is the face of the dock. (Workshop Tr. at 3120-24, 10/24/05.)
Later at the workshop Lemont stated:
 If I am able to gather what's happening here, the four of us are in agreement on all matters except one, and my recommendation was to expand to the west, and to expand 100 feet in a certain limited area. That I think the total area that I proposed is something like 1.7 acres. . . . (Workshop Tr. at 3179, 10/24/05.)
Goulet admitted that the proposal set forth by Lemont at the workshop sounded very similar to his plan. (Tr. at 47, 3/23.) Fugate concurred with Goulet that the plan Lemont advanced at the workshop was consistent with the Goulet plan. (Tr. at 55, 4/9/07.)
Following the vote, The Providence Journal reported that CRMC Chairperson Tikoian and member David Abedon, neither of whom voted on the Subcommittee, disagreed with the Subcommittee Recommendation. TheJournal reported that Abedon said he "hasn't read the full manuscript, but he favors a smaller expansion." (Ex. 1.) Reporter Lord also wrote, "Seconds after the vote at East Providence City Hall, CRMC Chairperson Michael Tikoian said he was `totally disappointed' and that when the matter comes to the full Council in another month or so, he would support Lemont's much more limited expansion scheme." (Ex. 1.) Tikoian confirmed that he told Peter Lord that he was disappointed in the Subcommittee and would consider *Page 35 
Lemont's proposal, but maintained that he had not formed a conclusion on the application at that time. (Tr. at 19-22, 4/5.) The Court rejects this testimony and accepts the testimony of Lord, who indicated that Tikoian had indeed expressed to him how he intended to vote when the matter went before the full Council. (Tr. at 81-82, 3/22.)
Additionally, in an October 29, 2005 article in the Block IslandTimes, reporter Peter Voskamp writes that "Chair Michael Tikoian also expressed his displeasure. He said he was `totally disappointed' with the vote, and that he `[backed] Paul Lemont 100 percent.'" (Ex. 24.)[27] Tikoian told Fugate that Lemont presented a good compromise, and Tikoian was going to support it when the full Council met. (Tr. at 37, 3/30.) Fugate testified that Tikoian told him that Tikoian would try to get a full Council vote on the Goulet plan. (Tr. at 48, 3/30; Tr. at 20, 4/2.)
These newspaper articles prompted Champlin's to move to disqualify Tikoian and Abedon from voting on the Subcommittee Recommendation for their alleged lack of impartiality and preconceived prejudice. In denying the motion as it pertained to him, Tikoian asserted:
 At no point in my conversation, with Mr. Lord, or with anyone else for that matter, did I indicate that my mind was made up or that I had made any final decision on this matter. . . . Further, as an ex-officio member of the subcommittee, I was entitled to participate in the subcommittee workshop and sit in the same position as subcommittee members in terms of forming an opinion on the evidence presented before a subcommittee. (Full Council Tr. at 17-18, 2/28/06.)
These comments now seem disingenuous in light of the additional evidence which was presented at the evidentiary hearing in this Court, and Tikoian's protest impacts negatively on his overall credibility. Additionally, the Court notes that although he sat as an ex-officio member of the Subcommittee, Tikoian was not entitled to participate along with Lemont, Sahagian, Ricci, *Page 36 
and Zarella because he did not attend all of the hearings. See CRMC Management Procedures § 3.
Shortly after the workshop, Tikoian organized a meeting among Goulet, Fugate, and himself with Governor Carcieri and his staff at the Governor's office. In preparation for that meeting, at Tikoian's suggestion, Adelman contacted Goulet and obtained slides depicting his plan. (Tr. at 69, 3/20; Tr. at 67, 4/5; see Ex. 15.) Goulet met with Tikoian the morning of the meeting with the Governor and showed Tikoian his plan. (Tr. at 22, 3/23.) Fugate recounted showing the Goulet plan to Tikoian:
 Mr. Tikoian asked us to put a presentation together for the governor's office. He wanted to review it before he went into the governor's office. So, we met with him that morning at his office and went over the presentation for the governor's briefing which also contained an alternative plan that was developed by Dan [Goulet]. (Tr. at 50-51, 3/30.)
Goulet presented the plan to the Governor and his staff. (Tr. at 30, 3/26.) Adelman testified that Tikoian spoke favorably of the Goulet plan at the meeting with the Governor and presented it as a potential compromise position to which the parties could agree. (Tr. at 84-85, 88-89, 3/20.) Adelman also testified that Tikoian predicted that the full Council vote would end in a tie. (Tr. at 91, 3/20; Tr. at 95, 3/21.) The Court rejects Adelman's effort to back away from this statement when questioned by counsel for the Intervenors, "with certainty I can't say whether it was a prediction or whether it was just a comment that there would be a tie." (Tr. at 95, 3/21.) From that same meeting, Adelman testified that he also received the impression that Tikoian would be voting against the Subcommittee Recommendation, though he did not have any specific memory of Tikoian explicitly stating how he would vote. (Tr. at 91-92, 3/20.) In response to whether Tikoian included himself in the side voting against the application, Adelman explained: *Page 37 
 I think my memory at the time was that it was a tie and that after he had counted off who the names were that voted against the proposal in the subcommittee that it would then result in a tie. I don't specifically remember him saying that he would vote a specific way, but I think when you took everything together as here is the presentation of the alternative plan, here is what we think could be a workable solution, and, then, the only other alternative is the original application, I think that is the assumption that was drawn from that. (Tr. at 91-92, 3/20.)
Adelman was confronted with his previous deposition[28] testimony that Tikoian had placed himself on the side in opposition to the Champlin's application. (Tr. at 93, 3/20.)
Adelman acknowledged that the Governor indicated at the meeting that the alternative plan was "a better option than the full plan." (Tr. at 30, 3/21.) After the meeting with the Governor, Tikoian kept the Governor's Chief of Staff informed about when the full Council vote would be held. (Tr. at 11-12, 4/5.) Based on all of the facts and circumstances proven at the evidentiary hearing, the Court finds that Tikoian presented the Goulet plan to the Governor because he wrongfully considered his role as chairperson as serving as a liaison between the Governor's office and CRMC. He not only wanted to keep the Governor informed on the status of the application, but also wanted to obtain the Governor's input and approval of the course he was taking. The Court finds that Tikoian displayed a clear interest in pleasing the Governor on the issue of Champlin's application. As such, Tikoian would have been very interested in learning from the Governor at their meeting that the Governor thought the alternate plan was "a better option than the full plan." (Tr. at 30, 3/21.)[29] *Page 38 
Prior to the February 28, 2006 meeting of the full Council, Goulet shared his plan with Council member Shekarchi. (Tr. at 1, 3/26; Tr. at 109, 3/26.) He also spoke with member Gray. (Tr. at 2, 3/26.) Abedon visited the CRMC offices before the vote and spoke with CRMC engineer Anderson, Fugate, and Goulet about alternatives that were not in the record. (Tr. at 66-67, 3/26.) The Court finds that Goulet did not act unilaterally, but only showed the proposal to council members because Tikoian and Lemont, directly or indirectly, encouraged or directed him to do so.
The Court accepts Sahagian's testimony that during this period of time, he spoke to Tikoian, who told him that he could not support anyone who was not on his team for reappointment. (Tr. at 79, 4/11.) Sahagian understood this comment as an attempt by Tikoian to influence his vote. (Tr. at 102, 4/11.) Sahagian was not reappointed by the Governor in January of 2007. (Tr. at 70, 4/11.)
At the conclusion of the evidentiary hearing, the Court issued a briefing schedule, but interrupted that schedule when the Rhode Island Supreme Court issued a decision in the case of Arnold v. Lebel,941 A.2d 813 (R.I. 2007). On January 2, 2008, this Court issued a Show Cause Order directing the parties to show cause why the Plaintiff's appeal should not be granted based on the likelihood that Arnold prohibited the type of off the record communications between voting CRMC members and staff members and others that occurred with the Champlin's application.
 2. The Arnold Show Cause Hearing
This Court held a hearing on the Show Cause Order on January 22, 2008. The Court suggested that the matter might be remanded to CRMC with directions, which order of remand *Page 39 
may include an order disqualifying one or more Council members from further consideration of the application. The Court agreed to permit additional limited evidence to be proffered at the Intervenors' request as to whether CRMC Subcommittee member Zarrella had acted improperly, warranting disqualification on remand. Zarella voted both at the Subcommittee workshop and again at the full Council meeting in favor of a 170-foot expansion. Champlin's Realty Assoc. v. Michael Tikoian etal., PC. 06-1659, March 20, 2008, (Bench Decision).
The hearing was conducted on April 9, 2008. The Town's first warden, John T. Savoie, testified that Zarella lobbied the Town to enter into mediation or a compromise agreement with Champlin's. According to Savoie, Zarella telephoned him and told him that Joe Grillo, Champlin's principal, "does a nice job down there"[30] and "that he had done a lot of good things for the Town and wasn't there anyway to work things out?" (Tr. at 13, 4/9/08.) Savoie testified that later, after one of the Town's alternative plans was presented at a Subcommittee hearing, Zarrella initiated a conversation with Savoie to tell him that the plan was ridiculous. (Tr. at 14, 4/9/08.) In that conversation, Zarrella purportedly criticized the Town's evidence when he said that the Town's witnesses, Barbara McMullen and Douglas Hoyt, "were terrible witnesses and would [sic] take a lot to overcome the damage they had done." (Tr. at 21, 4/9/08.) Savoie acknowledged that Zarrella never told him he intended to vote on the application, nor recommended any specific or general plan to Savoie. (Tr. at 31, 37, 4/9/08.)
Robert Ellis Smith, a Town Council member, testified about a conversation he had with Zarella in the spring of 2005. Smith recalled that Zarella told him:
 [T]he island didn't understand Joe Grillo. He had done a great job at Champlin's, that the islanders were kind of naïve about not respecting development and seeing [sic] a good project when they *Page 40 
saw it. Here was a man that was interested in commerce and the island was turning a deaf ear toward him and that I should get to know him. (Tr. at 45-46, 4/9/08.)
According to Smith, before he testified before the Subcommittee, Zarella spoke to him in support of the application. (Tr. at 45, 47, 4/9/08.) He urged the "island" to approve the application. He quoted Zarella as stating, "The community should go along with this, that it was a sound plan for the island." (Tr. at 46, 4/9/08.) Also, "I think that [Grillo is] entitled to this. He's entitled to this expansion." (Tr. at 46, 4/9/08.)
Nancy Dodge, the Town Manager, testified that she had a conversation with Zarella after one of the Subcommittee hearings. (Tr. at 64, 4/9/08.) She recalled that Zarella told her ". . . that Joe Grillo was a good guy, that he did a lot for the island, that the application was for a reasonable expansion, that businesses should be allowed expansion." (Tr. at 65, 4/9/08.) Like Savoie, Dodge recalled that Zarrella criticized the testimony of the Town's witnesses and also expressed anger that Savoie had spoken against the application before the Subcommittee. (Tr. at 67-68, 4/9/08.) Dodge further testified regarding a third telephone call from Zarrella, encouraging her to settle with Champlin's. (Tr. at 66, 4/9/08.) Dodge also acknowledged that Zarrella never told her how he would vote, nor stated his position on the application. (Tr. at 72, 4/9/08.)
The Court finds the testimony of these Town officials credible, particularly in light of the aforementioned comments Zarella made at the meeting of the full Council on February 28, 2006. Zarella, like Tikoian and Lemont, failed to appreciate the quasi-judicial nature of his role.
On April 28, 2008, Champlin's moved that Michael Tikoian, Paul Lemont, Neill Gray, *Page 41 
Michael Sullivan, Donald Gomez, and Bruce Dawson[31] be disqualified from further participation in Champlin's application in the event that the matter is remanded to CRMC. Additionally, it expanded its appeal from the decision of the full Council and moved that the votes of Tikoian, Lemont, Gray, and Sullivan be disqualified from the February 28, 2006 full Council vote.
After the conclusion of all hearings, the parties submitted briefs in support of their respective decisions. While this Court was reviewing those briefs, the Rhode Island Supreme Court issued an advisory opinion that impacts the issues pertinent to this matter. In re Request forAdvisory Opinion from the House of Representatives (Coastal ResourcesManagement Council), 961 A.2d 930 (R.I. 2008). Rhode Island's House of Representatives sought advice from our Supreme Court regarding the constitutionality of proposed CRMC legislation. That legislation, like the current CRMC enabling statute to which it is virtually identical, granted the General Assembly and the Governor appointment power to the CRMC. See id. at 932 (citing H.R. 2007-H 6266); Section 46-23-2(a). The House of Representatives asked, among other things, whether this proposed CRMC legislation violates Article 9, section 5 of the Rhode Island Constitution, which grants just the Governor appointment power with respect to members of any state entities exercising executive power. Advisory Opinion, 961 A.2d at 932. Specifically, our Supreme Court found that the proposed provisions "cannot be reconciled with our Constitution to the extent that it would permit sitting legislators to serve on the CRMC and would allow the General Assembly to make some appointments to that body." Id. at 941. Instead, recognizing the CRMC's exercise of executive power, our Supreme Court held that it is therefore the Governor, who has "the right to appoint its member with the advice and consent of the Senate." Id. at 941-42. *Page 42 
Despite such constitutional infirmities in the proposed legislation, which essentially mirrors the current CRMC statute, however, the Rhode Island Supreme Court clarified that the CRMC's "administrative actions and determinations to this date[] . . . should be accorded de facto
validity." Id. at 942 n. 18. Importantly, for purposes of this decision, the Rhode Island Supreme Court explained its reasoning in according suchde facto validity to the CRMC's "past acts," with analogy to the United States Supreme Court, which similarly "declined to invalidate governmental actions presumably taken in good faith prior to judicial resolution of a complex legal question." Id. Of particular relevance to the instant matter, our Supreme Court noted that the United States Supreme Court has "declined to provide retrospective remedies which would substantially disrupt governmental progress and functions."Id. (citations omitted). Thus, the validity of the CRMC's actions thus far in the present matter, which has encompassed numerous hearings and determinations, is clear.
 B Standard of Review
This Court sits as an appellate court with a limited scope of review when reviewing the decisions of an administrative agency such as CRMC.Mine Safety Appliances Co. v. Berry, 620 A.2d 1255, 1259 (R.I. 1993). The standard of review, codified at § 42-35-15(g) provides:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law; [sic.]
 (5) Clearly erroneous in view of the reliable, probative, and *Page 43 
substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 42-35-15(g).
This Court's review authority granted by § 42-35-15 is "circumscribed and limited to `an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision.'" Nickerson v. Reitsma, 853 A.2d 1202, 1205 (R.I. 2004) (quoting Barrington Sch. Comm. v. Rhode Island State Labor RelationsBd., 608 A.2d 1126, 1138 (R.I. 1992)); see Environmental Scientific Corp.v. Durfee, 621 A.2d 200, 208 (establishing that the agency's rationale should be supported by competent legal evidence). This Court must affirm the agency's decision if any legally competent evidence exists in the record. Rhode Island Pub. Telecomm. Auth. v. Rhode Island State LaborRelations Bd., 650 A.2d 479, 485 (R.I. 1994). "Legally competent evidence is indicated by the presence of `some' or `any' evidence supporting the agency's findings." Durfee, 621 A.2d at 208 (citingSartor v. Coastal Resources Mgmt. Council, 542 A.2d 1077, 1082-83 (R.I. 1988)); see Arnold v. Rhode Island Dept. of Labor and Training Bd. ofReview, 822 A.2d 164, 167 (R.I. 2003) (defining legally competent evidence as "relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance[]") (quoting Rhode Island Temps,Inc. v. Dep't of Labor and Training, Bd. of Review, 749 A.2d 1121, 1125
(R.I. 2000)).
The scope of review of this Superior Court "is an extension of the administrative process." Durfee, 621 A.2d at 208. Like the DEM Director, who decides "a case upon recommendations by a hearing officer [and] need not actually hear the witnesses testify or hear oral arguments,"id. at 207 and § 42-17.7-6, the CRMC full Council renders its decision after the subcommittee submits its "written proposed findings of fact and proposed conclusions of law . . . *Page 44 
for review." Section 46-23-20.4. The CRMC full Council, like the DEM Director, may "adopt, modify, or reject the findings of fact and/or conclusions of law provided, however, that any modification or rejection of the proposed findings of fact or conclusions of law shall be in writing and shall state the rationales therefor." Section 46-23-20.4(a);see Durfee, 621 A.2d at 203 (citing § 42-17.7-6(1)). In rendering its decision, the CRMC full Council has before it the record of the full hearing(s) before the Subcommittee, and upon formal submission of the Subcommittee Recommendation to the full Council, the "partiesmay present new evidence before the full Council at the full Council hearing."[32] CRMC Management Procedures § 5.3(2) (emphasis in original). The Court notes that the full Council in the instant matter chose not to have any new evidence presented to it.[33]
This Court, like the second-tier decision-maker in the agency process, accords different levels of deference to the decision-maker below. The decision-maker in the CRMC administrative scheme — one that encompasses a hearing officer or subcommittee — is like that of the DEM, which includes a hearing officer that conducts "`adjudicatory proceedings[]' . . . and is clearly charged with a quasi-judicial role." JohnstonAmbulatory Surgical Associates, Ltd., 755 A.2d at 805 (R.I. 2000). The Court, like the second-tier decision-maker, must observe that "the further away from the mouth of the funnel that an administrative official is when he or she evaluates the adjudicative process, the more deference should be owed to the factfinder." Durfee, 621 A.2d at 208. In particular, when a subcommittee or hearing officer has relied on its credibility determinations, the second-tier decision-maker should give great deference to the *Page 45 
findings and conclusions of the subcommittee or hearing officer, unless they are clearly wrong. See id. at 209.
"[I]t is also a well-recognized doctrine of administrative law that deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency." Pawtucket Power Assocs. Ltd. P'ship v. City ofPawtucket, 622 A.2d 452, 456 (R.I. 1993) (citations omitted). An agency, when granted authority by the General Assembly, may enact regulations that carry the force and effect of law. See Parkway Towers Assocs. v.Godfrey, 688 A.2d 1289, 1293 (R.I. 1997) (citations omitted). "Administrative agencies retain broad enforcement discretion and, as always, considerable deference is accorded to such agencies about how to enforce regulations." Arnold, 941 A.2d at 820-821. Also, this Court must defer to an agency's reliance on its expertise. "It is apodictic that a reviewing court should accord an agency's decision considerable deference when that decision involves a technical question within the field of the agency's expertise." R.I. Higher Educ. Assistance Auth. v.Sec'y U.S. Dep't of Educ., 929 F.2d 844, 857 (1st Cir. 1991) (citations omitted).
Section 42-35-15(f) offers an exception to the rule that this Court is confined to the certified record in an administrative appeal. See NorthFulton Cmty. Hosp., Inc. v. State Health Planning Dev. Agency,310 S.E.2d 764, 768 (Ga.Ct.App. 1983). Section 42-35-15(f) permits this Court to hear evidence, in addition to the certified record, when procedural irregularities have occurred at the agency:
 (f) The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs. Section 42-35-15(f). *Page 46 
In the absence of alleged procedural irregularities, an assertion that the administrative record is incomplete is not a sufficient basis for a hearing pursuant to § 42-35-15(f). See Ault v. Washington State HighwayComm'n, 462 P.2d 546, 548 (Wash. 1969). "In deciding whether or not procedural irregularities occurred, and, if so, whether they were prejudicial to any party's rights, the superior court renders judgment without a jury." North Fulton Cmty. Hosp., Inc., 310 S.E.2d at 768. When this Court hears testimony, "[T]he credibility of witnesses and the weight to be accorded their testimony is solely the function of the trial justice." State v. Nania, 786 A.2d 1066, 1068 (R.I. 2001) (citingState v. Hull, 754 A.2d 84, 86 (R.I. 2000)). Our Supreme Court does not weigh the evidence taken by this Court, but "merely examine[s] the record to determine whether [this Court's] decision was supported by competent evidence." Johnston Ambulatory Surgical Associates, Ltd.,755 A.2d at 805 (citing Barrington Sch. Comm., 608 A.2d at 1138); see alsoDurfee, 621 A.2d 200, 208 ("[The Supreme Court is] not privileged to assess the credibility of witnesses and may not substitute [its] judgment for that of the trial examiner concerning the weight of evidence on questions of fact.") (citation omitted).
With respect to remedies, this Court
 may reverse, modify, or remand the agency's decision if the decision is violative of constitutional or statutory provisions, is in excess of the statutory authority of the agency, is made upon unlawful procedure, is affected by other errors of law, is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record, or is arbitrary or capricious and is therefore characterized by an abuse of discretion. Nickerson, 853 A.2d at 1205
(quoting Barrington Sch. Comm., 608 A.2d at 1138
(R.I. 1992)).
This Court may not substitute its judgment for the agency's with respect to "credibility of the witnesses or the weight of the evidence concerning questions of fact. However, an administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, *Page 47 
and substantial evidence contained in the whole record." Costa v.Registrar of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988) (citingNewport Shipyard, Inc. v. Rhode Island Comm'n for Human Rights,484 A.2d 893 (R.I. 1984)). Additionally, "Questions of law . . . are not binding upon the court and may be reviewed to determine what the law is and its applicability to the facts." State v. Faria 947 A.2d 863, 867 (R.I. 2008) (citations omitted). Also, this Court will reverse factual conclusions of administrative agencies only when they are "totally devoid of competent evidentiary support in the record." Bunch v. Bd. ofReview, Rhode Island Dept. of Employment and Training, 690 A.2d 335, 337
(R.I. 1997) (quoting Milardo v. Coastal Resources Management Council ofRhode Island, 434 A.2d 266, 272 (R.I. 1981)); see Nguyen v. Chater,172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (establishing that the court will invalidate findings of fact which are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.") (citations omitted). "It is clear that the Superior Court justice has some discretion in fashioning a remedy when hearing an appeal from an agency decision." Birchwood Realty, Inc. v. Grant,627 A.2d 827, 834 (R.I. 1993).
 C CRMC's Statutory Scheme
The Rhode Island Constitution Article 1, section 17 provides:
 The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, including but not limited to fishing from the shore, the gathering of seaweed, leaving the shore to swim in the sea and passage along the shore; and they shall be secure in their rights to the use and enjoyment of the natural resources of the state with due regard for the preservation of their values; and it shall be the duty of the general assembly to provide for the conservation of the air, land, water, plant, animal, mineral and other natural resources of the state, and to adopt all means necessary and proper by law to protect the natural environment of the people of the state by *Page 48 
providing adequate resource planning for the control and regulation of the use of the natural resources of the state and for the preservation, regeneration and restoration of the natural environment of the state.
In order to ensure these constitutional rights are protected, the legislature created CRMC and charged it with the duty "to preserve, protect, develop and where possible, restore the coastal resources of the state for this and succeeding generations through comprehensive and coordinated long-range planning and management designed to produce the maximum benefit for society from such coastal resources. . . ." Section 46-23-1(a)(2). CRMC's primary responsibility is "the continuing planning for and management of the resources of the state's coastal region." Section 46-23-6(1)(i). To that end, CRMC is "authorized to approve, modify, set conditions for, or reject" any "proposed development or operation within, above, or beneath the tidal water below the mean high water mark, extending out to the extent of the state's jurisdiction in the territorial sea. . . ." Section 46-23-6(2)(ii)(A-B). Additionally, CRMC may "[g]rant licenses, permits, and easements for the use of coastal resources which are held in trust by the state for all its citizens, and impose fees for private use of these resources." Section 46-23-6(4)(iii). While the duties of CRMC are extensive, our Supreme Court has commented that CRMC's discretion in carrying out its duties is quite narrow: "far from granting broad discretion to the council, the statute specifically directs the council to be guided by this single overriding criterion: `[p]reservation and restoration of ecological systems shall be the primary guiding principle upon which environmental alteration of coastal resources will be measured, judged, and regulated.'" Milardo v. Coastal Resources Management Council of RhodeIsland, 434 A.2d 266, 271 (1981) (internal citation omitted).
CRMC must comply with the terms of its enabling legislation and its regulations. Ratcliffe v. Coastal Resources Management Council,584 A.2d 1107, 1110 (R.I. 1991). The *Page 49 
CRMC enabling statute provides for administrative hearings for contested cases:
 All contested cases, all contested enforcement proceedings, and all contested administrative fines shall be heard by the administrative hearing officers, or by subcommittees as provided in § 46-23-20.1, pursuant to the regulations promulgated by the council, provided, however, that no proceeding and hearing prior to the appointment of the hearing officers shall be subject to the provisions of this section." Section 46-23-20; see CRMC Management Procedures § 1.2 (defining contested case as a proceeding in which the legal rights, duties or privileges of a specific party are required to be determined by the Council after an opportunity for hearing).
Because hearing officers have not been appointed, CRMC relies on subcommittees to conduct hearings on contested cases, pursuant to its statutory authority at § 46-23-20.1(e):
 Whenever the chairperson of the coastal resources management council or, in the absence of the chairperson, the commissioner of coastal resources makes a finding that the hearing officers are otherwise engaged and unable to hear a matter in a timely fashion, he or she may appoint a subcommittee which will act as hearing officers in any contested case coming before the council. The subcommittee shall consist of at least one member, provided, however, that in all contested cases an additional member shall be a resident of the coastal community affected. The city or town council of each coastal community shall, at the beginning of its term of office, appoint a resident of that city or town to serve as an alternate member of the aforesaid subcommittee should there be no existing member of the coastal resources management council from that city or town available to serve on the subcommittee. Any member of the subcommittee actively engaged in hearing a case shall continue to hear the case, even though his or her term may have expired, until the case is concluded and a vote taken thereon. Hearings before subcommittees shall be subject to all rules of practice and procedure as govern hearings before hearing officers. Section 46-23-20.1(e).
Section 46-23-20.4(a) addresses the subcommittee's statutory role, which is that of the hearing officer referred to therein. "After due consideration of the evidence and arguments, the hearing officer shall make written proposed findings of fact and proposed conclusions of law which shall be made public when submitted to the council for review." Section 46-23-20.4(a). Further, *Page 50 
CRMC Management Procedures provide that when a subcommittee has been appointed, the full hearing shall take place before the subcommittee. CRMC Management Procedures § 5.3(2). The subcommittee reports its recommendation to the full Council and provides the record of the subcommittee hearing for the full Council's review. Id. In order to vote on the subcommittee's recommendation, a subcommittee member must have attended all of the hearings. CRMC Management Procedures § 3.
After the full Council receives the subcommittee's recommendation and the full hearing record, "The council may, in its discretion, adopt, modify, or reject the findings of fact and/or conclusions of law provided, however, that any modification or rejection of the proposed findings of fact or conclusions of law shall be in writing and shall state the rationales therefor." Section 46-23-20.4(a). The full Council may also permit the parties to present new evidence before the full Council at the full Council hearing. CRMC Management Procedures § 5.3(2). No member may participate in the full Council's decision unless that person has reviewed the subcommittee hearing record in its entirety. CRMC Management Procedures § 5.3(3). While a subcommittee can consist of just one member, § 46-23-4 delineates the quorum required for the full Council to act, "A quorum shall consist of seven (7) members of the council. A majority vote of those present shall be required for action." Section 46-23-4; see also CRMC Management Procedures §§ 2.1-2.2. The full Council's final decision must be in writing and contain findings of fact and conclusions of law separately stated. CRMC Management Procedures § 8.1. The findings of facts must be based exclusively on the administrative record and matters officially noticed. CRMC Management Procedures § 8.2.
With respect to matters pending before a Hearing Officer (or a subcommittee in lieu thereof), the CRMC enabling statute forbids ex parte communications between council members *Page 51 
and hearing officers (or a subcommittee in lieu thereof). Section 46-23-20.5 provides: "Council members shall have no communication directly or indirectly, with a hearing officer relating to any issue of fact or of law on any matter then pending before the hearing officer." Additionally, CRMC is "subject to the provisions of the Rhode Island Administrative Procedures Act (RIAPA), G.L. 1956 (1988 Reenactment chapter 35 of title 42.)." Ratcliffe, 584 A.2d at 1110. The RIAPA presents its own prohibition against ex parte contacts at § 42-35-13:
 Unless required for the disposition of ex parte matters authorized by law, members or employees of an agency assigned to render an order or to make findings of fact and conclusions of law in a contested case shall not, directly or indirectly, in connection with any issue of fact, communicate with any person or party, nor, in connection with any issue of law, with any party or his or her representative, except upon notice and opportunity for all parties to participate; but any agency member:
 (1) May communicate with other members of the agency, and
 (2) May have the aid and advice of one or more personal assistants. Section 42-35-13.[34]
 D No Harbor Management Plan Bound CRMC
The Town contends that Champlin's application should have been denied because the Town's Harbor Management Plan[35] ("HMP") bars the proposed expansion by fixing a location *Page 52 
and delineation for Mooring Field E into which Champlin's proposed expansion would intrude.[36] If the Court accepts the Town's argument, it may then find that the CRMC decision denying the application was the correct decision, albeit based upon incorrect findings. See Mesolella v.City of Providence, 439 A.2d 1370, 1373 (R.I. 1982) (Where agency decision is correct, though based on the wrong reasons, a court may uphold it).
The Town argues that no state statute or CRMC regulation provides that HMPs expire, so, despite initial approval of the 1991 plan for a period of five years, the ordinances enacted as a part of the 1991 plan control the permitting for the Great Salt Pond. Alternatively, the Town contends that the 1999 plan was a valid exercise of the Town's independent delegated authority to regulate its harbor and in the absence of CRMC action, the 1999 plan must guide permitting. Rhode Island law does not support the Town's position. *Page 53 
In Champlin's Realty Associates, L.P. v. Tillson, 823 A.2d 1162, 1169
(R.I. 2003), the Rhode Island Supreme Court recognized that "[b]y granting exclusive authority . . . to CRMC, the General Assembly has expressed its intent to preempt municipal regulation of `development, operations, and dredging' occurring below the mean high-water mark."Id. Accordingly, the Court declared that "[a]ny municipal attempt to regulate these activities is preempted whether or not the `regulatory activity . . . [is] disruptive or otherwise inconsistent with the state's regulatory scheme.'" Id. (quoting Town of East Greenwich v.Narragansett Electric Co., 651 A.2d 725, 729 (R.I. 1994)). Thus, in the absence of an ongoing delegation of regulatory authority, municipal regulations on CRMC-controlled subject matter are preempted and void.See id.
Here it is undisputed that the 1991 plan was approved by the CRMC for a period of five years and that the Town of New Shoreham did not submit a new HMP for Great Salt Pond until 1999. The CRMC, in both the Subcommittee Recommendation and Objectors' Decision, determined that "The Town's Harbor Management Plan, which was approved in 1991, expired in 1996. The Town did not reapply for a renewal of that plan until at least sometime in 1999. The CRMC does not recognize the validity of the subsequent plan until it is approved by the CRMC." (Subcommittee Recommendation at 11; full Council Decision at 5-6.) The Town therefore contends that as an approved HMP, the provisions of the 1991 plan remained effective until a new HMP is approved.
Rhode Island law does not require CRMC approvals to be permanent and unchanging. Rather, CRMC's organic statute requires updates and revisions to its planning programs every five years. Section 46-23-6(1)(v)(VI). The obligation of "continuing planning for and management of the resources of the state's coastal region" is perpetual and ongoing. Section 46-23-6(1)(i). Furthermore, "the council is authorized to grant permits, licenses, and easements for *Page 54 
any term of years or in perpetuity . . ." and "[p]ermits, licenses oreasements issued by the council are valid only with the conditions andstipulation under which they are granted and imply no guarantee ofrenewal. . . ." Section 46-23-16 (emphasis added). At the same time, this state has long recognized agency authority to grant conditional approvals for a limited time. See Woodbury v. Zoning Board of Review ofthe City of Warwick, 78 R.I. 319, 319, 82 A.2d 164, 164 (1951) (finding no abuse of discretion where a zoning board issued a special exception limited to two years); Lizotte v. Mitchell, 771 A.2d 884, 885 (R.I. 2001) (recognizing, in the context of a private action, that DEM had issued an individual sewage disposal system approval that would expire, in all circumstances, within two years). It follows that CRMC may exercise its authority to limit its approvals to a specific time after which the approval expires. Because, in this instance, the approval sub-delegates CRMC's power, once the initial five-year period expires, the time limited and location specific HMP is superseded by the generally applicable and enduring CRMP.[37] See Town of EastGreenwich, 651 A.2d at 725 (R.I. 1994). Such a result is consistent with CRMC's exclusive jurisdiction and very purpose because it ensures that decisions impacting coastal resources are made pursuant to a set of criteria that have been updated within the previous five years rather than pursuant to a plan that, though at one time consistent with the CRMP, is now out of date and obsolete. Comporting with CRMCs continuing statutory obligations to steward coastal resources, the CRMC's policy of approving HMPs only for a period of five years is both legally permissible and makes good sense.
Alternatively, the Town urges that the 1999 plan is valid as an exercise of the Town's authority, under § 46-4-2, § 46-4-6.10, and § 46-22-14, providing for local control of harbors and *Page 55 
boating. Sections 46-4-2(a) and § 46-4-6.10(a) vest New Shoreham with the authority to appoint a harbormaster and to establish related harbor ordinances. While those delegations empower the Town to regulate a large swath of harbor activities, the powers authorized by § 46-4-6.10(a) are expressly subordinate to the powers of the CRMC. See
Section 46-4-6.10(b), "[n]o powers or duties granted herein shall be construed to abrogate the powers or duties granted to the coastal resources management council as provided in chapter 23 of this title, as amended." Thus, despite the Town's authority to adopt ordinances governing aspects of the harbor, those ordinances must still receive CRMC approval if such approval would otherwise be required.[38] Likewise, under § 46-22-14(a), municipalities are entitled to regulate boating on local waters only to the extent that such local regulations are identical to the state promulgated rules. See Section 46-22-14(a). ("nothing in this chapter shall be construed to prevent the adoption of any ordinance or local law . . . the provisions of which are identical to the provisions of this chapter. . . ."). As an activity that impacts upon the state's coastal resources, such ordinances must also receive CRMC approval. Furthermore, the Court does not find that passage of harbor regulations pursuant to a HMP is akin to passage of public health and safety ordinances pursuant to a Town's home rule charter. See State ex rel.Town of Westerly v. Bradley, 877 A.2d 601, 607-08 (R.I. 2005). Unlike a home rule charter, which is a creature of state constitutional law, the HMP program exists as a creature of the CRMC's regulatory authority. Thus, the Town's attempt to exercise authority pursuant to an un-adopted HMP is void ab initio. Accordingly, because the 1999 plan has yet to receive that approval with respect to Mooring Field E, this Court finds that no HMP constrained CRMC's consideration of Champlin's application. *Page 56 
 E Ex Parte Contacts
While this matter was pending before this Court, the Rhode Island Supreme Court decided Arnold v. Lebel, 941 A.2d 813 (2007), which prohibits ex parte communications even with agency staff members. It is well settled that:
 The case law condemns such ex parte contacts because they (1) violate statutory requirements of public hearings, and concomitant rights of the public to participate in the hearings, (2) may frustrate judicial review of agency decisions, and (3) may violate due process and fundamental fairness rights to a hearing. The impropriety of ex parte contact in administrative adjudication is well established. E E Hauling, Inc. v. Pollution Control Bd., 451 N.E.2d 555, 571
(Ill.App. 1983).
In Arnold, medical assistance applicants brought an action against the Rhode Island Department of Human Services (DHS), seeking declaratory and injunctive relief to prevent DHS hearing officers from engaging in ex parte, off-the-record communications about their cases which were pending before the DHS hearing officer. Aronld, 941at 816. The Supreme Court ruled that under the RIAPA, hearing officers may not engage in ex parte communications with anyone, including DHS staff, about facts and opinions relating to a pending case. Id. at 821.
With respect to ex parte communications in the administrative context, the Arnold Court decided, "§ 42-35-13 of the APA prohibits ex parte
communication with anyone about contested or material adjudicatory facts or opinions concerning the merits of an applicant's pending appeal . . . to prevent litigious facts from reaching the decision-maker off the record in an administrative hearing." Id. at 820 (emphasis in original) (citing Martone v. Lensink, 541 A.2d 488, 492 (Conn. 1988)). However, the Arnold Court limited the prohibition against ex parte communications by explaining that hearing officers could engage in discussion of general matter, like hearing schedules, procedural matters, and general information about how hearings are conducted at DHS. The hearing officers may also attend staff meetings and participate in *Page 57 
discussions about general, agency policy. Id. at 821-22. If an agency decision-maker were to consult staff, our Supreme Court required the following:
 [I]n accordance with § 42-35-9(e) and § 42-35-10(4), the hearing officer must provide notice to the parties before a hearing if he or she intends to consult any documentary source or person concerning facts or opinions about the merits of an appeal. In addition, the parties must be afforded an opportunity to contest any such evidence and to cross-examine any people consulted. Id. at 821.
Lastly, the Arnold Court added that all evidence received or considered must be on the administrative record. Id. The Arnold Court summarized as follows:
 Unless the parties are given notice and an opportunity to respond on the record, including cross-examination, if appropriate, a DHS hearing officer may not communicate with anyone, including DHS staff members, about contested adjudicatory facts-including, but not limited to, test results, specific diagnostic information, opinions concerning the severity of an applicant's medical conditions, or overall assessment of a client's disabilities or disability status. All facts and opinions, including opinions of agency professionals and staff, as well as information obtained from an outside source, such as medical texts or the Internet, must be included on the record if the hearing officer plans to base his final decision on such facts. In short, no litigious facts should reach the decision-maker off the record in an administrative hearing. Id.
While the Arnold decision clarified illicit ex parte communications in the administrative context in Rhode Island, it did not provide a specific remedy for such improper contact.
Federal courts have expounded on when illicit ex parte communications taint an agency's decision. Various ex parte communications occurred inProfessional Air Traffic Controllers Organizations v. Federal LaborRelations Authority (PATCO), 685 F.2d 547 (D.C. Cir. 1982), involving an air traffic controllers strike. The PATCO Court found a meeting between an Federal Labor Relations Authority (FLRA) member and a well-known labor leader, in which the two discussed the appropriate punishment for a striking union, most troubling. Id. at 560. The *Page 58 PATCO Court reviewed the Federal Administrative Procedure Act's provision against ex parte communication, 5 U.S.C. § 557(d), noting that Congress had not provided specific provisions for judicial remedy of improper ex parte communications. The PATCO Court found "improper ex parte communications, even when undisclosed during agency proceedings, do not necessarily void an agency decision. Rather, agency proceedings that have been blemished by ex parte communications have been held to be voidable." Id. at 564 (citations omitted).
The PATCO Court laid out a standard for approaching ex parte communications:
 [A] court must consider whether, as a result of improper ex parte communications, the agency's decisionmaking process was irrevocably tainted so as to make the ultimate judgment of the agency unfair, either to an innocent party or to the public interest that the agency was obliged to protect. In making this determination, a number of considerations may be relevant: the gravity of the ex parte communications; whether the contacts may have influenced the agency's ultimate decision; whether the party making the improper contacts benefited from the agency's ultimate decision; whether the contents of the communications were unknown to opposing parties, who therefore had no opportunity to respond; and whether vacation of the agency's decision and remand for new proceedings would serve a useful purpose." Id. at 564-65 (footnotes omitted).[39]
The PATCO Court cautioned, "If the ex parte contacts are of such severity that an agency decision-maker should have disqualified himself, vacation of the agency decision and remand to an impartial tribunal is mandatory." Id. at 565, n. 33 (citing Cinderella Career FinishingSchools v. FTC, 425 F.2d 583, 591-92 (D.C. Cir. 1970)).
With respect to gravity of the contacts in PATCO, the court noted that the labor leader had not threatened the FLRA member or made any promises. Id. at 571. The PATCO Court *Page 59 
also stated that the meeting had no effect on the ultimate decision of the FLRA member or the FLRA as a whole. Id. As a result, no party benefited from the improper contact. Id. at 572. Furthermore, because the labor leader had advocated a favorable position for PATCO, PATCO had not been deprived of an opportunity to refute the ex parte communication. Id. Ultimately, finding none of the ex parte communications had "irrevocably tainted" the FLRA's decision or effected procedural unfairness on any of the parties, the PATCO Court found no reason to vacate the FLRA decision or remand the case. Id. at 573-74, 566. In Power Authority of State of N.Y. v. F.E.R.C., 743 F.2d 93 (2d Cir. 1984), the Second Circuit essentially adopted this PATCO standard in determining whether an entire agency should be disqualified based on ex parte communications. The Power Authority Court explained what types of communications warranted disqualification:
 Ex parte communications by Congressmen or any one else with a judicial or quasi-judicial body regarding a pending matter are improper and should be discouraged. On the other hand, the mere existence of such communications hardly requires a court or administrative body to disqualify itself. Recusal would be required only if the communications posed a serious likelihood of affecting the agency's ability to act fairly and impartially in the matter before it. In resolving that issue, one must look to the nature of the communications and particularly to whether they contain factual matter or other information outside of the record, which the parties did not have an opportunity to rebut." Power Authority, 743 F.2d at 110 (internal citations omitted); see also Southwest Sunsites, Inc. v. F.T.C., 785 F.2d 1431, 1436 (9th Cir. 1986).
The Power Authority Court ultimately determined that disqualification of the agency was unnecessary because the parties had been informed of agency decision-makers' ex parte communications and had a full opportunity to respond. Power Authority, 743 F.2d at 110.
Ex parte communications between the decision-maker and staff, this time in the form of charts prepared by a staff specialist who assisted a hearing officer, occurred in Nationwide Mut. *Page 60 Ins. Co. v. Ins. Comm'r, 509 A.2d 719 (Md.App. 1986). In this case, a hearing officer had considered these charts, extra-record evidence, in ruling in favor of an insurance agent challenging the rates of an insurance company. The Maryland Court found, with respect to the charts, that the staff specialist had simply compiled evidence from the hearing, which the insurer had an opportunity to rebut. Furthermore, "[T]he charts did not originate from an independent source and did not constitute new evidence, but were merely illustrative and thus not necessary to [the hearing officer's] decision." Id. at 725-26. Ultimately, the Nationwide Court determined that the hearing officer's decision was supported by substantial and competent evidence.Id. at 727.
Ex parte contacts in the context of two layers of agency consideration warranted recusal and transfer to a body uninfected by ex parte communications as an appropriate remedy in Press Broadcasting Co., Inc.v. F.C.C., 59 F.3d 1365 (D.C. Cir. 1995). In this case, the Mass Media Bureau granted a party's petition seeking to reinstate its construction permit. Id. at 1368. Arguing ex parte contacts had influenced the adjudication, another broadcaster filed an emergency petition to vacate the Mass Media Bureau's action. Id. The Mass Media Bureau recused itself and forwarded the matter to the FCC's general counsel, which forwarded the matter to the full FCC for de novo review. Id. The FCC similarly voted in favor of the party that engaged in ex parte communications.Id. Because of the Mass Media Bureau's recusal and the FCC's unaffected de novo review, the Press Broadcasting Court determined that the FCC's decision had not been "irrevocably tainted" so as to make the ultimate judgment of the agency unfair, under the PATCO standard, without citing the PATCO factors explicitly. Id. at 1369-70 ("The Bureau's recusal and Commission's de novo review of the matter ultimately defeats the inference of improper influence. . . ."). *Page 61 
With respect to the Court's imposition of a remedy, "the principal concerns of the court are the integrity of the process and the fairness of the result, mechanical rules have little place in a judicial decision whether to vacate a voidable agency proceeding. Instead, any such decision must of necessity be an exercise of equitable discretion."PATCO, 685 F.2d at 565. One possible remedy following allegations of ex parte contacts, similar to that utilized by this Court under § 42-35-15(f) in the instant matter, is an evidentiary hearing to investigate ex parte contacts. Portland Audubon Soc'y v. EndangeredSpecies Comm., 984 F.2d 1534 (9th Cir. 1993) involved allegations that the White House had improper ex parte communications with members of a committee. Finding that the committee was subject to the federal APA rules regarding ex parte contacts, the Ninth Circuit ordered the committee to hold an evidentiary hearing, with the aid of an administrative law judge, to investigate the "nature, content, extent, source, and effect of any ex parte communications." Id. at 1549. The administrative law judge was then to submit his findings and recommendations regarding the ex parte communications to the same Ninth Circuit panel, before which the parties would argue as to which further proceedings were necessary. Id. at 1550.
Again in Eaton v. Rosewood Center, 586 A.2d 804 (Md.App. 1991), the appellate court upheld the trial court's decision to remand the matter for a hearing regarding an improper ex parte communication at the agency. In Eaton, the Secretary of the Department of Personnel had improperly considered a letter, off the record, contending that an employee should be dismissed. The trial court found that the letter was an improper ex parte communication necessitating a remand to the Department of Personnel to conduct a hearing. Id. at 809. The appellate court found that the remand for further proceedings was not an abuse of discretion:
 [w]hen the agency has committed an error of law, i.e., by considering improperly an ex parte communication . . . the court *Page 62 
should remand the case to the agency for further proceedings designed to remedy the error. Since the . . . letter was not part of the record . . . it could not be used properly as the basis for a final decision. The trial court correctly observed that appellant's request for a hearing regarding the impact of the letter should have been granted to ensure that the final Order of the [agency] is based only on matters contained in the record. Id. at 809 (internal citation omitted).
Additional state cases offer further examples of remedies for ex parte communications at the administrative level. An Illinois case offers an alternative method of dealing with ex parte communications to the investigational hearing provided for in Portland Audubon Soc'y andEaton. In City of Rockford v. County of Winnebago, 542 N.E.2d 423
(Ill.App. 1989), the municipality argued that ex parte contacts had tainted a local board's decision to deny the city's application for a pollution control facility. Id. at 431. Prior to the city's appeal, the reviewing board learned of the ex parte contacts at the local board when the city called former and current local board members to testify. Id. at 426. The reviewing board concluded that fundamental fairness required recusal of several local board members and supplementary hearings. Id.
Specifically, the reviewing agency directed that the substance of the ex parte contact should be added to the record, and the local board should render its decision based on the required statutory criteria.Id. Such a procedure, according to the reviewing board, would
 allow the substance of most if not all ex parte contacts, as well as the contact of radio and other ads, to be reviewed on the record. It will give all [WCB] Members a chance to re-evaluate the record and render a decision based solely on that record. The Board notes that the hearing record itself appears to be complete and developed in a fundamentally fair manner. This process should remove the procedural clouds from this proceeding and allow it to proceed on the merits. Id.
Following this order, the local board held two hearings at which at least 18 members of the local board testified as to the scope of their ex parte communications. Id. at 427-28. The *Page 63 
reviewing board affirmed the resulting local board decision, determining that the city had not been denied fundamental fairness. Id. at 428. The Appellate Court of Illinois upheld the decision, finding "that the remand and placing of the ex parte contacts on the record removed the danger of prejudice. . . ." Id. at 431. Thus, the Appellate Court of Illinois employed a combination of disqualification and remand as a potential remedy for improper ex parte contacts in agency adjudications.See Press Broadcasting, 59 F.3d at 1369-70 (upholding the decision of the FCC because the Mass Media Bureau had recused itself and the FCC had engaged in de novo review).
Overall, the case law establishes that agency members are prohibited from consulting with agency staff concerning facts or opinions about the merits of a pending case, unless the parties have the opportunity to contest such evidence and cross-examine those consulted.Arnold, 941 A.2d 813. Impermissible consultations with agency staff may "irrevocably taint" the agency's decision-making process so as to make the agency's final decision unfair to a party or the public interest.PATCO, 685 F.2d at 564. This Court's decision regarding whether to vacate an agency decision as "irrevocably tainted" is not subject to mechanical rules, and this Court must exercise its equitable discretion.See id. at 565.
 1 The Subcommittee's Recommendation
In determining whether the decision appealed from was "irrevocably tainted" by ex parte communications, the Court begins by addressing the evidentiary hearings before the Subcommittee. Notably, no party has suggested that the record of the twenty-three hearings is other than complete and developed in a fundamentally fair manner. Also, the CRMC did not choose to take new or further evidence. The Court has reviewed the record of the Subcommittee *Page 64 
hearings, and finds no basis for concluding that they are incomplete or were not developed in a fundamentally fair manner.
Turning to the workshop, the Court must determine whether exposure to ex parte communications irrevocably tainted the Subcommittee Recommendation. To do so, the Court must address whether the Subcommittee Recommendation was impacted either by the Goulet plan as advanced by Lemont and Tikoian and/or by Zarella's improper ex parte communications.
The Goulet plan clearly falls within the purview of prohibited ex parte communications addressed by the Supreme Court in Arnold v.Lebel, interpreting § 42-35-13, as well as under § 46-23-20.5. Prior to the Subcommittee workshop, every member of the Subcommittee was exposed to the Goulet plan. Lemont directed CRMC staff's development and presentation of the Goulet plan. (Tr. at 95-96, 3/26; Tr. at 84, 87, 4/13; Tr. at 70, 4/12.) Additionally, in the weeks before the workshop, Goulet showed the plan to Ricci; and, Tikoian visited Ricci's law office to advocate for the plan. (Tr. at 30, 37, 3/23; Tr. at 115, 3/26; Tr. at 34, 3/20.) Fugate and Goulet also showed Sahagian the Goulet plan prior to the workshop at CRMC's Wakefield office. (Tr. at 73, 4/11; Tr. at 13, 4/9/07; Tr. at 96-97, 4/11.) At Tikoian's house, Tikoian urged Sahagian to support the Goulet plan. (Tr. at 76-77, 4/11.) Lastly, Tikoian and Lemont spoke over the telephone to Zarrella to obtain his support for the plan. (Tr. at 44, 3/19; Tr. at 45-46, 3/19.) On the evidence before it, this Court finds that the three Subcommittee members who voted in favor of the Subcommittee Recommendation were not tainted by the Goulet Plan even though at least two of them had been exposed to it. Like the meeting between the agency decision-maker and the labor leader inPATCO, it appears that the Goulet plan did not affect the outcome of the Subcommittee vote. See PATCO, 685 F.2d at 571. The three Subcommittee members voting in favor of the Subcommittee Recommendation expressed indifference or outright hostility towards *Page 65 
the Goulet plan. Sahagian expressed frustration to Goulet and Fugate when they presented the plan to him. (Tr. at 96-97, 4/11.) Additionally, Sahagian informed Tikoian that attempting to obtain his support for the plan was fruitless. (Tr. at 77, 4/11.) Zarrella also protested the Goulet plan's existence when he joined Sahagian in the minutes before the workshop and threatened to walk out of the workshop if Lemont chose to present the slides of the Goulet plan. (Tr. at 50, 59-64, 3/19; Tr. at 28-29, 4/12; Tr. at 81, 4/12; Tr. at 84, 4/2.) As a result of Zarrella and Sahagian's insistence, the Goulet plan was not introduced at the workshop. At no point did Ricci demonstrate approval of the Goulet plan. (Tr. at 35, 3/20; Tr. at 58, 4/11.) Accordingly, the Court finds that the Goulet plan did not irrevocably taint the Subcommittee hearings and Recommendation. See PATCO, 685 F.2d at 571-74.
Although Lemont, at the workshop, interjected the Goulet plan by arguing in favor of a proposal that mirrored Goulet's, he failed to muster any support other than his own, and the Subcommittee recommended a 170-foot extension with a 25-foot perimeter by a vote of three-to-one. (Subcommittee Recommendation at 7.) In spite of Zarella's wrongful ex parte communications during the hearing process with New Shoreham officials exhibiting favor toward Champlin's, no evidence exists that Zarrella attempted to influence Subcommittee members against the positions of the Town or intervenors or that either Sahagian or Ricci were influenced by Zarella's bias. (Tr. at 13-14, 21, 45-47, 64-68, 4/9/08); see PATCO, 685 F.2d at 564-65 (listing whether the ex parte contacts influenced the agency's ultimate decision as a consideration for whether the decision was irrevocably tainted).
This Court finds that the Subcommittee Recommendation was supported by the record evidence. As this Court has earlier noted, supra at 17, the Subcommittee made forty-seven findings of fact. This Court, after thoroughly reviewing the Subcommittee record, is satisfied that *Page 66 
those findings and the ultimate Recommendation are supported by the evidence.
 2 The CRMC Decision
Alternatively, the evidence demonstrates that the Goulet plan "irrevocably tainted" the consideration and ultimate decision of CRMC on Champlin's application in violation of § 42-35-13, as interpreted inArnold v. Lebel. The Rhode Island Supreme Court explained that § 42-35-13 prohibits agency decision-makers from communicating with anyone, including agency professionals like Goulet and Fugate, about contested, adjudicatory facts without giving notice to the parties and the opportunity to respond on the record, including cross-examination.Arnold, 941 A.2d at 821. The contested, adjudicatory facts at issue in CRMC's review of Champlin's application included whether a marina expansion should be granted, and if so, the size of the expansion and where should it be located. (See Full Council Decision at 2-12.) Furthermore, by relying on the Goulet plan as providing a solution to the contested case before it, CRMC abdicated its statutory obligation to render its own decision based upon the evidence presented. Even indirect contact with the Goulet plan amounted to receipt of an ex parte communication contravening § 42-35-13. See Arnold, 941 A.2d at 820
(prohibiting ex parte communication with anyone about contested or material adjudicatory facts or opinions).
Members received the Goulet plan in a number of different ways. Lemont subtly introduced the Goulet plan under the guise of his independent ingenuity at the full Council meeting, thereby exposing each member of CRMC to Goulet's proposal. (Full Council Tr. at 107-109, 188-89, 2/28/06.) As described above, Lemont and Tikoian directed the Goulet plan's development. (Supra at 29; Tr. at 95-96, 3/26; Tr. at 84, 87, 4/13; Tr. at 70, 4/12.) Ricci and Sahagian saw the plan before the workshop, and Tikoian and Lemont spoke to Zarella about it. *Page 67 
(Tr. at 30, 37, 3/23; Tr. at 115, 3/26; Tr. at 96-97, 4/11; Tr. at 44-46, 3/19.) As the Court noted earlier, supra at 29, Tikoian acted jointly with Lemont to have the plan prepared and selectively shared with council members. Shekarchi viewed the plan prior to the full Council vote. (Tr. at 1, 3/26; Tr. at 109, 3/26.) Also, Goulet admitted to discussing various alternatives with Gray and Abedon prior to the full Council vote. (Tr. at 2, 3/26; Tr. at 66-67, 3/26.)
As expressed earlier, there is no question that Lemont and Tikoian shared responsibility for directing staff to develop the plan and served as its chief advocates with other members. The Court finds that Tikoian shared the Goulet plan with the Governor under his mistaken belief that he had a personal obligation to keep the Governor advised of the status of the case and his own need to obtain the Governor's approval of his efforts. This Court finds that Tikoian's contact with the Subcommittee members violates § 46-23-20.5, which prevents CRMC members from communicating with a hearing officer, or in this case subcommittee, relating to any issue of fact or law on matters pending before the subcommittee. In addition to advocating the plan to members, Tikoian publicly vowed to The Providence Journal, unprompted, to vote for Lemont's edition of the Goulet plan immediately following the workshop. (Ex. 1.) Similar comments appeared in a Block Island Times article. (Ex. 24.)
Unlike the meeting in PATCO, which did not "irrevocably taint" the agency decision, the Goulet plan's stain seeps through the full Council's written decision rejecting the Subcommittee Recommendation, in paragraphs that lament Champlin's failure to seek westward expansion and praising the staff's alternative designs. (Full Council Decision, ¶¶ 38, 39, 66, 67, at 6-10; see PATCO, 685 F.2d at 571.) Those voting against the Subcommittee Recommendation found, "Many of the points made by the staff are valid, particularly relating to the use of alternative designs, more efficient utilization of the existing facilities and area, and the costs for dredging *Page 68 
and expansion to the west." (Full Council Decision ¶ 39, at 7.) Lemont and Tikoian's unabashed support for the Goulet plan, multiple attempts to influence the votes of CRMC members, and elements of the Goulet plan appearing in CRMC's written Decision, evidence the gravity of these ex parte communications. They strongly suggest that the ex parte communications influenced those members who voted against the Subcommittee Recommendation at the meeting of the full Council. These actions on the part of Tikoian and Lemont contribute significantly to this Court's determination that the vote against the Subcommittee Recommendation was "irrevocably tainted" by the Goulet plan. SeePATCO, 685 F.2d at 564-65 (listing gravity of ex parte communications and whether the contacts may have influenced the agency's ultimate decision as factors determining whether an agency's decision has been irrevocably tainted).
Recalling that Arnold regards § 42-35-13 as necessary "to prevent litigious facts from reaching the decision-maker" off the administrative record, this Court notes that the Goulet plan was not an amalgamation of evidence in the administrative record. See Arnold, 941 A.2d at 820. Unlike the charts prepared by the staff specialist in Nationwide Mut.Ins. Co., the Goulet plan was not merely illustrative and did constitute new evidence. See Nationwide Mut. Ins. Co., 509 A.2d at 725-26. Goulet explained that he consulted with Mr. Liberti at DEM, even visiting Mr. Liberti at his office, to discuss water quality issues and obtain a model to analyze water quality that was not part of the administrative record. (Tr. at 111, 3/22; Tr. at 15-16, 3/23; Tr. at 102, 3/26.) Goulet also revealed that he did independent research to negate the testimony of Mr. Borne, the applicant's expert. (Tr. at 97-98, 3/26.) Goulet stated that he relied on his professional judgment, including his understanding of the Town's requirement of a 100-foot buffer between moorings and commercial structures. (Tr. at 99, 3/26.) Lastly, Fugate testified *Page 69 
that the staff contacted the Army Corps of Engineers to get their view of the marina expansion, and their opinion was taken into consideration in drafting the Goulet plan. (Tr. at 92, 4/2.) Unlike the staff specialist's charts in Nationwide Mut. Ins. Co., the Goulet plan was not a compilation of evidence that the parties had an opportunity to rebut during the Subcommittee hearings. See Nationwide Mut. Ins. Co.,509 A.2d at 725-26. The Goulet plan's constitution of litigious facts not appearing in the administrative record adds to the seriousness of these ex parte communications. It evidences that the contents of the communications were unknown to the parties, thereby contributing to this Court's determination that the vote of the full Council rejecting the Subcommittee Recommendation was "irrevocably tainted." See Arnold,941 A.2d at 820; PATCO, 685 F.2d at 564-65 (listing gravity of ex parte communications and whether the contents of the communications were unknown to the opposing parties as factors determining whether an agency's decision has been irrevocably tainted).
Arnold dictates that in accordance with § 42-35-9(e) and § 42-35-10(4), if an agency decision-maker elicits facts and opinions from agency professionals, they must be included on the record, and the agency professional must be subject to cross-examination, if the decision-maker plans to base his decision on such material.Arnold, 941 A.2d at 821. The Goulet plan was never placed on the record, and Champlin's was never given an opportunity to confront it. The Court notes that Lemont's thwarted attempt to present the plan at the workshop was not in the form of reopening the evidence and permitting the parties to cross-examine Goulet after notice. (Tr. at 79-80, 4/13.) Likewise, at the meeting of the full Council, CRMC made no effort to reopen the evidence to receive additional testimony. Instead, Lemont subtly referred to the substance of the plan in the presence of those who had been secretly informed of its existence. The Court finds that those who voted against the Subcommittee Recommendation would have *Page 70 
been irrevocably influenced by the Goulet plan. See Arnold,941 A.2d at 821; PATCO, 685 F.2d at 564-65 (listing whether the contents of the communications were unknown to the opposing parties who, as a result, had no opportunity to respond, as a factor determining whether an agency's decision has been irrevocably tainted). Those who voted in favor of the Subcommittee Recommendation evidenced a rejection of the improper staff proposal and a rejection of Tikoian and Lemont's efforts to convince them to accept it.
 F Disqualification as a Result of Ex Parte Contacts
As noted in PATCO, the Court must focus on the integrity and fairness of the administrative process and final decision. PATCO,685 F.2d at 564-65. To that end, this Court in its equitable discretion must fashion a remedy. Id. This Court finds that reversal of the decision of those CRMC members opposing the Subcommittee Recommendation serves a useful purpose because the Goulet plan affected CRMC's final vote.Id. (stating that usefulness of the vacation of an agency decision is a factor in determining whether the decision has been "irrevocably tainted"). The fact patterns of Portland Audubon Soc'y andEaton, wherein courts remanded cases to administrative bodies to investigate ex parte communications, are not analogous to the instant matter. Portland Audubon Soc'y, 984 F.2d at 1549; Eaton, 586 A.2d 809-10. This Court has already conducted evidentiary hearings. The Court finds the remedy of disqualification employed in City of Rockford more appropriate to the facts before it here because fundamental fairness requires that administrative applicants have their applications decided by neutral decision-makers on the evidence in the record. See EEHauling, Inc., 451 N.E.2d at 571; La Petite Auberge, Inc. v. RhodeIsland Commission for Human Rights, 419 A.2d 274, 283-84 (R.I. 1980) (establishing that a person shall not be tried before an administrative *Page 71 
tribunal that is biased or otherwise indisposed from rendering a fair and impartial decision). Thus, this Court must examine which members must be disqualified.
Rhode Island case law is sparse regarding disqualification for an agency violation of the prohibition against ex parte contacts. The Court does not order disqualification lightly. In Davis v. Wood, 427 A.2d 332
(R.I. 1981), a man who lost his license to operate a solid waste management facility successfully challenged a decision of a Department of Environmental Management (DEM) hearing officer in Superior Court. The trial justice found that the hearing officer seemed to be fully aware of the agency's case and had asked DEM's attorney if he intended to present certain evidence. Upon review, our Supreme Court determined that the inferred ex parte communications were insufficient to demonstrate bias. The Rhode Island Supreme Court noted, "Agency officials are presumed to be capable of judging a particular controversy fairly on the basis of its own circumstances. Therefore, the fact that [the hearing officer] was aware of the DEM's case, without more, does not show bias."Id. at 337 (citation omitted); see also La Petite Auberge, Inc. v. RhodeIsland Commission for Human Rights, 419 A.2d 274, 284 (R.I. 1980) (establishing a presumption of honesty and integrity for administrative adjudicators); Schweiker v. McClure, 456 U.S. 188, 195-96 (1982) ("As this court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities. We must start, however, from the presumption that the hearing officers . . . are unbiased.") (citations omitted). At the same time, the Rhode Island Supreme Court acknowledged that agency decision-makers can squander their presumption of fairness:
 [A] hearing officer must be impartial and must not attempt to establish proof to support the position of any party to the controversy. Once he does so, he becomes an advocate or participant, thus ceasing to function as an impartial trier of fact. Such a transformation gives rise to a lack of the fundamental fairness required by due process. Davis, 427 A.2d at 337 (citations *Page 72 
omitted).
The Supreme Court restated these principles in Kent County Water Auth.v. State Dept. of Health, 723 A.2d 1132 (R.I. 1999). In that case, the Water Authority sought the recusal of the Department of Health's (DOH) hearing officer due to his employment with DOH. Our Supreme Court stated: "To overcome the presumption in favor of an adjudicator's honesty and integrity, a party claiming bias or some other disqualifying factor must adduce evidence that: (1) the same person(s) involved in building one party's adversarial case is also adjudicating the determinative issues; and/or (2) other special circumstances render the risk of unfairness intolerably high." Id. at 1137 (citing La PetiteAuberge, Inc. v. Rhode Island Commission for Human Rights, 419 A.2d 274,285 (R.I. 1980)).
Although Rhode Island lacks case law specifically addressing disqualification for an agency's ex parte communications, its standard for disqualification based on bias or prejudice is well-settled. Recently, in Ryan v. Roman Catholic Bishop of Providence, 941 A.2d 174
(R.I. 2008) cert. denied, 129 S.Ct. 422 (2008), our Supreme Court rejected arguments that the trial justice should have been recused from considering her case. In so finding, our Supreme Court noted: "It is a well-recognized principle that judicial officers are duty-bound to recuse themselves if they are `unable to render a fair or an impartial decision in a particular case.' . . . A party seeking recusal must establish that the justice has a `personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his [or her] impartiality seriously and to sway his [or her] judgment.'"Id. at 185[40] (quoting Kelly v. R.I. Pub. Transit *Page 73 Auth., 740 A.2d 1243, 1246 (R.I. 1999) (quoting Cavanagh v.Cavanagh, 118 R.I. 608, 621, 375 A.2d 911, 917 (1977)); cf. In reAntonio, 612 A.2d 650, 654 (R.I. 1992) (reiterating that mere criticism of a party or his counsel does not indicate prejudice). Although administrative adjudicators are not judges, they act in a quasi-judicial capacity. Town of Richmond v. Wawaloam Reservation, Inc., 850 A.2d 924,933 (R.I. 2004) ("An administrative tribunal acts in a quasi-judicial capacity when it affords the parties substantially the same rights as those available in a court of law, such as the opportunity to present evidence, to assert legal claims and defenses, and to appeal from an adverse decision."). Administrative adjudicators, like judges, must be impartial:
 "Obviously, the Due Process Clause of the Fourteenth Amendment guarantees that a person shall not be tried before an administrative tribunal that is biased or otherwise indisposed from rendering a fair and impartial decision. Marshall v. Jerrico, Inc., 446 U.S. 238, —, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182, 188 (1980); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Fundamental fairness includes the right not to be judged by one's party opponent." La Petite Auberge, Inc., 419 A.2d at 283-84 (citations omitted).
Federal courts have frequently addressed issues of bias or prejudice in the administrative context. For example, in ATX, Inc. v. U.S. Dept.of Transp., 41 F.3d 1522 (D.C. Cir. 1994), the circuit court examined whether political pressure on the Department of Transportation compromised the administrative process for certification of a new airline. That pressure consisted of 125 House and Senate members writing letters to the Secretary of Transportation to oppose the certification, two members of Congress introducing a bill to prevent the applicant *Page 74 
from entering the airline industry, and congressional testimony opposing the certification. Id. at 1525-26. The Department of Transportation considered the record de novo, but ultimately sided with the Administrative Law Judge's (ALJ) recommendation against certification of the airline. Id.
Importantly, the D.C. Circuit Court laid out the test for bias or prejudice: "The test is whether `extraneous factors intruded into thecalculus of consideration' of the individual decisionmaker." PeterKiewit Sons' Co. v. United States Army Corps of Eng'rs, 714 F.2d 163,170 (D.C. Cir. 1983); ATX, 41 F.3d at 1527 (further citations omitted) (emphasis in original). The circuit court further explained that "theappearance of bias or pressure may be no less objectionable than the reality." Id. (citations omitted) (emphasis in original). Overall, the circuit court noted, judicial evaluation must examine the "nexus" between the political pressure and the decision-maker. Id.
Applying this test, the ATX Court found that the effect of the two bills introduced in the House of Representatives was insignificant because they were not addressed directly to the decision-makers.Id. at 1528. The circuit court further found that the Congressional letters did not influence the final decision-maker because he had insulated his decision-making process and had issued a lengthy opinion based entirely on and supported by the record. Id. Lastly, the circuit court found, with respect to the congressman's testimony to the ALJ:
 [T]he testimony here falls short of creating a fatal appearance of bias as it was based almost entirely on information already available to the ALJ, was void of threats and was not relied on in any of the decisions, which were accompanied by extensive findings and reasons. In context, the omission of any reference to the testimony seems to represent a recognition that it was, in the end, irrelevant. Id. at 1529.
The ATX Court concluded that political influence did not enter the decision-maker's "calculus of *Page 75 
consideration." Id. at 1530.
In addition to bias resulting from political influence, federal courts have addressed bias resulting from personal friendships. In Cheney v.U.S. Dist. Court for D.C., 541 U.S. 913 (2004), a party moved for the recusal of Justice Scalia, who had gone duck hunting with Vice President Cheney, flying in the Vice President's plane, while a case in which Cheney was a party in his official capacity was pending before the U.S. Supreme Court. Pursuant to 28 U.S.C. § 455(a), Justice Scalia was obligated to recuse himself if his "impartiality might reasonably be questioned." Justice Scalia acknowledged that under certain circumstances, friendship could be enough for a disqualification, "[W]hile friendship is a ground for recusal of a Justice where the personal fortune or the personal freedom of the friend is at issue, it has traditionally not been a ground for recusal where officialaction is at issue, no matter how important the official action was to the ambitions or the reputation of the Government officer."Id. at 916 (emphasis in original). Thus, finding that such official action was involved in the pending Cheney matter, Justice Scalia determined recusal was not warranted. Id. at 926.
In addition to bias resulting from political influence and personal friendship, federal courts have addressed agency prejudgment of adjudicative facts. In Cinderella Career Finishing Schools, Inc. v.F.T.C., 425 F.2d 583 (D.C. Cir 1970), the circuit court reviewed the Federal Trade Commission's (FTC) cease and desist order to petitioners for engaging in allegedly unfair and deceptive practices. The FTC chairperson had made a speech before the Government Relations Workshop of the Nations Newspaper Association that referenced facts from the case among other examples of fraud. Id. at 589-90. The circuit court laid out the following test: "The test for disquaification [sic] has been succinctly stated as being whether `a disinterested observer may conclude that (the agency) has in some measure adjudged the facts as *Page 76 
well as the law of a particular case in advance of hearing it.'"Id. at 591 (quoting Gilligan, Will Co. v. SEC, 267 F.2d 461, 469 (2d Cir. 1959) cert. denied, 361 U.S. 896 (1959)).
Applying its test to the FTC's chairperson's comments, the circuit court determined, "Conduct such as this may have the effect of entrenching a Commissioner in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record." Id. at 590. The circuit court stated that the chairperson's comment "[gave] the appearance that he [had] already prejudged the case and that the ultimate determination of the merits [would] move in predestined grooves." Id.
Generally, courts have distinguished among prejudging law, policy, legislative fact, and adjudicatory fact. "A previously announced position on a disputed issue of law, policy, or legislative fact does not disqualify a decisionmaker." II Richard J. Pierce, Jr.,Administrative Law Treatise, § 9.8 at 669 (4th ed. 2002 and Cum. Supp.). For example, in F.T.C v. Cement Institute, 333 U.S. 683 (1948), the Federal Trade Commission (FTC) was accused of prejudice and bias during a proceeding that culminated in the FTC's issuance of a cease and desist order. Prior to the proceeding, the FTC had filed reports with Congress and the President, and several of its members had testified before congressional committees, stating that the multiple basing point system at issue was a price fixing scheme in violation of the Sherman Act.Id. at 700. The United States Supreme Court explained, "[T]he fact that the Commission had entertained such views as the result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices." Id. at 701; see Hortonville Joint School Dist.No. 1 v. Hortonville Educ Assocs., 426 U.S. 482, 493 (1976) ("[A] decisionmaker [is not] disqualified simply because he has taken a position, *Page 77 
even in public, on a policy issue related to the dispute, in the absence of a showing that he is not `capable of judging a particular controversy fairly on the basis of its own circumstances.'") (citations omitted).
With these standards in mind, the Court will review the conduct of the individual CRMC members to determine whether they should have been disqualified from participating in either the Subcommittee workshop and Subcommittee Recommendation or the meeting and vote of the full Council.
 1 The CRMC Members
Michael Tikoian
This Court reverses CRMC's decision on Champlin's motion to disqualify Tikoian, finding that Tikoian should have been disqualified from participating in the full Council vote on Champlin's application. The Court bases this finding on Tikoian's numerous ex parte communications with CRMC Subcommittee members, CRMC staff, reporters, the Governor's staff and with the Governor himself. These contacts, when considered in the aggregate, reflect prejudgment of the Champlin's application and the appearance of impropriety.
While the Subcommittee hearings were occurring, Tikoian promised Subcommittee members Zarrella and Sahagian at the National Hotel on Block Island that he would develop a compromise for them to approve. (Tr. at 40-41 3/19; Tr. at 72, 4/11; Tr. at 5-6, 4/12.) The Court concludes that Tikoian was instrumental in having staff prepare the Goulet plan and lobbied members of the Subcommittee in favor of that proposal at a time when contact with them on the subject was prohibited by law. Later, Tikoian even threatened Sahagian with the loss of his seat on CRMC unless Sahagian agreed to support the Goulet plan. (Tr. at 79, 4/11.) Tikoian *Page 78 
misunderstood his role as chairperson as empowering him to influence the Subcommittee members and attempted to exert such influence.
The Court finds that his contacts with the Governor's office intruded into Tikoian's "calculus of consideration" of Champlin's application.See Kent County Water Auth. v. State Dept. of Health, 723 A.2d at 1137. The overwhelming weight of evidence overcomes the presumption of honesty and integrity afforded an agency adjudicator because he abandoned his role as an impartial adjudicator. See La Petite Auberge, Inc.,419 A.2d at 284 (establishing a presumption of honesty and integrity for administrative adjudicators); Kent County Water Auth. v. State Dept. ofHealth, 723 A.2d at 1137 (establishing that the presumption of honesty and integrity is lost when the same person building an adversarial case is adjudicating the determinative issues). As our Supreme Court said inDavis, "Once he does so, he becomes an advocate or participant, thus ceasing to function as an impartial trier of fact." Davis,427 A.2d at 337.
There is no question that extraneous factors intruded into his consideration of the application, and he failed to insulate his decision-making process from these outside influences. See ATX,41 F.3d at 1528. Tikoian misunderstood his role as an agency adjudicator and served as CRMC's liaison to the Governor's office. (Tr. at 75, 77-78, 3/20.) His involvement as liason with the Governor's office and his meeting with the Governor demonstrate that he actually encouraged outside influence and certainly created the appearance of outside influence. (Tr. at 30, 3/21.) He even told the Governor that he expected a tie vote. (Tr. at 91, 3/20; Tr. at 95, 3/21.) His involvement with the Goulet plan and his improper attempts to influence the Subcommittee in favor of the plan violate the principles of fundamental fairness required by due process. See id. Tikoian's commitment to the plan and to a disposition of the contested case that was *Page 79 
acceptable to non-parties evidenced a "personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his . . . impartiality seriously and to sway his . . . judgment."Ryan, 941 A.2d at 185.
Tikoian's comments to The Providence Journal and Block IslandTimes, proclaiming his commitment to Lemont's version of the Goulet plan, further demonstrate the degree of his prejudgment. (Ex. 1; Ex. 24.) Like the FTC chairperson's comments in Cinderella, Tikoian's public comments entrenched him in a position opposed to both Champlin's application and the Subcommittee Recommendation, destroying his ability to approach with an open mind the deliberation process at the meeting of the full Council. His public comments gave him a vested interest in achieving an outcome consistent with his statements. Cinderella Career Finishing Schools, Inc., 425 F.2d at 590. Like the comments of the school board members in Staton, Tikoian's comments to reporters, along with his lobbying efforts, exceeded the limits of public expressions of law and policy. Staton, 552 F.2d at 914. A disinterested observer would conclude that Tikioan certainly had "in some measure adjudged the facts as well as the law of a particular case in advance of hearing it."Id. at 591.
For the foregoing reasons, this Court finds that Michael Tikoian should have been disqualified from participating in the decision of the full Council.
Paul Lemont
This Court finds that Lemont also should have been disqualified from participating in the Subcommittee workshop and in the meeting and vote of the full Council. Like Tikoian, he engaged in ex parte communications with CRMC staff and lobbied on behalf of the Goulet plan. It was Lemont who directed Fugate to have Goulet draft an alternate plan. (Tr. at 95-96, 3/26; Tr. at 87, 4/14; Tr. at 84, 4/13.) At Tikoian's request, he met with the Governor to discuss the *Page 80 
status of the case while he was serving as Chair of the Subcommittee. (Tr. at 70, 4/13.) He acted in concert with Tikoian in an effort to defeat not only the application as submitted, but also the Subcommittee Recommendation. Lemont actually admitted that he was influenced by outside pressures, such as newspaper editorials when he directed Fugate to have an alternate plan created. (Tr. at 87, 4/13. see also Tr. at 70, 4/12.)
When Goulet completed his alternative plan, Lemont instructed Goulet to show it to designated individuals. (Tr. at 75, 4/12.) Lemont also spoke with Zarrella on the telephone prior to the workshop to advocate for the Goulet plan. (Tr. at 45-46, 3/19.) When Sahagian and Ricci persuaded Lemont that Goulet should not be invited to present slides of his plan at the workshop, Lemont was not deterred. At the workshop and later before the full Council, Lamont argued for a compromise position which contained elements of the Goulet plan, thereby attempting to infect both proceedings with matters outside the record. (Workshop Tr. at 3120-24, 3179, 10/24/05; full Council Tr. at 107-09, 188-89, 2/28/06.)
Like Tikoian, Lemont lost his presumption of honesty and integrity as an agency adjudicator and became an advocate. See Davis,427 A.2d at 337. He demonstrated "personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his . . . impartiality seriously and to sway his . . . judgment."Ryan, 941 A.2d at 185. For the foregoing reasons, this Court finds that Paul Lemont should have been disqualified from participating in the workshop and in the decision of the full Council.
Gerald Zarrella
This Court finds that Zarrella should have been disqualified from participating in the workshop and the vote of the full Council because his ex parte communications with New Shoreham Town officials reflects personal bias against the Town. This Court does not base such *Page 81 
finding on his exposure to the Goulet plan. Like the decision-maker inATX, who was exposed to letters from members of Congress, Zarrella was not influenced by the pressure exerted on him by Lemont and Tikoian.See ATX, 41 F.3d at 1528. In the moments before the workshop, Zarrella, along with Sahagian, insisted that the Goulet plan not be shown at the workshop, even threatening to walk out, because they considered the plan's introduction improper. (Tr. at 50, 59-64, 3/19; Tr. at 28-29, 4/12; Tr. at 81, 4/12; Tr. at 84, 4/2.) As further evidence that his vote was unaffected by the Goulet plan, Zarrella voted in favor of the Subcommittee Recommendation and joined the Findings of Fact of CRMC Members in Support of the Subcommittee Recommendation after the full Council vote, neither of which referenced the Goulet plan. (Subcommittee Recommendation at 6; Findings of Fact of CRMC Members in Support of the Subcommittee Recommendation at 7.); see ATX, 41 F.3d at 1529 ("In context, the omission of any reference to the [potentially biasing testimony] seems to represent a recognition that it was, in the end, irrelevant.").
Although Zarrella did not succumb to the pressure of Tikoian and Lemont, he exhibited prejudice against the Town and bias toward Champlin's. Three Town officials testified about Zarrella's ex parte communications with them. During the Subcommittee hearing process, Zarrella praised Champlin's principal, Grillo, to Town representatives, Savoie, Smith, and Dodge, complimenting the work Grillo does at Champlin's and seeking a compromise or concession from New Shoreham. (Tr. at 13, 45-46, 65, 4/9/08.) He told Smith that Grillo was "entitled to this expansion." (Tr. at 46, 4/9/08.) Zarella further told Smith that the
 islanders were kind of naïve about not respecting development and seeing [sic] a good project when they saw it. Here was a man that was interested in commerce and the island was turning a deaf ear toward him and that I should get to know him. (Tr. at 45-46, 4/9/08.) *Page 82 
The fact that Zarella may be prone to favor development is not in and of itself grounds for disqualification. He enjoys a presumption of honesty and integrity as a hearing officer. However, in this case, that presumption has been rebutted because he demonstrated support for the position of one party. Once he did that, Zarella became an advocate or a participant, ceasing the ability to function as an impartial trier of fact. That transformation gave rise to the lack of fundamental fairness required by due process. See Davis, 427 A.2d at 337.
Furthermore, after one of the hearings, Zarella told Savoie that the Town's alternate plan was ridiculous and that the Town's witnesses were terrible and it "would [sic] take a lot to overcome the damage they had done." (Tr. at 14, 21, 4/9/08.) Such comments communicated a message to the Town that he was biased in favor of Champlin's and was serving as the applicant's advocate and negotiator rather than as an impartial trier of fact.
In addition to complimenting the work Grillo was doing at Champlin's, Zarrella told Dodge after one of the Subcommittee hearings that Grillo was a "good guy." (Tr. at 65, 4/9/08.) Zarrella was familiar with Grillo's operation at Champlin's because at certain times prior to the Subcommittee hearings, he had kept his boat at Champlin's. (Tr. at 12-13, 3/20.) This Court finds that Zarrella's ex parte comments, which favored Champlin's position in the contested case over that of the Town, give rise to the appearance of personal bias or prejudice which would impair his impartiality. See Ryan, 941 A.2d at 185. For the foregoing reasons, this Court finds that Gerald Zarrella should have been disqualified from participating in the workshop and decision of the full Council.
The Remaining Members
Aside from seeking to disqualify Tikoian and Lemont, Champlin's moved to disqualify Abedon before the meeting of the full Council and moves on appeal to disqualify Gray and *Page 83 
Sullivan as well.[41] The Court rejects Champlin's argument as it relates to anyone other than Tikoian and Lemont. It is most unfortunate that some members engaged in ex parte communications in violation of § 42-35-13, as interpreted in Arnold. See Arnold, 941 A.2d at 820
(prohibiting ex parte communications with anyone about contested or material adjudicatory facts or opinions). It astounds the Court that members of CRMC had so little appreciation of the need to be impartial and to present the appearance of impartiality in connection with their service on the Council. However, none of their communications rises to the level that would warrant disqualification. The Court is satisfied that their conduct did not demonstrate an attempt to establish proof favoring one party over another. See Davis, 427 A.2d at 337 ("[A] hearing officer must be impartial and must not attempt to establish proof to support the position of any party to the controversy."). The remaining members of CRMC are entitled to a presumption of honesty and integrity. See Kent County Water Auth., 723 A.2d at 1137. No evidence exists that any of them had a "personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his . . . impartiality seriously and to sway his . . . judgment."Ryan, 941 A.2d at 185.
Gray consulted with CRMC staff on two occasions in violation of § 42-35-13, as interpreted in Arnold. See Arnold, 941 A.2d at 820
(prohibiting ex parte communications with anyone about contested or material adjudicatory facts or opinions). Gray spoke with Goulet at CRMC's office about alternatives in general prior to the full Council vote. (Tr. at 2, 3/26.) Additionally, at the full Council vote, Gray revealed that he used CRMC staff to take measurement from one of Champlin's plans. (Full Council Tr. at 112, 2/28/06.) This Court finds that Gray clearly did not exhibit "personal bias or prejudice by reason of a preconceived or *Page 84 
settled opinion of a character calculated to impair his . . . impartiality seriously and to sway his . . . judgment." Ryan,941 A.2d at 185.
Sullivan indicated that he had consulted with his staff at DEM, off the record, and had not read the entire Subcommittee record, in violation of CRMC Management Procedures § 5.3(3). (Full Council Tr. at 185, 2/28/06.) Sullivan's consultation with his staff was a violation of § 42-35-13. See Arnold, 941 A.2d at 820. This Court finds that Sullivan consulted his staff as a matter of convenience rather than as an attempt to establish proof favoring one party over another. See Davis,427 A.2d at 337 ("[A] hearing officer must be impartial and must not attempt to establish proof to support the position of any party to the controversy."). Therefore, Sullivan is entitled to a presumption of honesty and integrity. See Kent County Water Auth., 723 A.2d at 1137. Regarding Sullivan's failure to read the entire record — namely, the objections, Sullivan indicated that he had not read every objection on the record. (Full Council Tr. at 185, 2/28/06.) The Court infers from that statement that he did read all of the testimony, and although he failed to read the entire record as required, his failure under the circumstances does not "render the risk of unfairness intolerably high."See Kent County Water Auth., 723 A.2d at 1137.
Champlin's moved to disqualify Abedon based upon a report in TheProvidence Journal following the Subcommittee workshop, that Abedon, though not having read the entire record, favored a smaller expansion. (Ex. 1.) The article reads, "Another council member who observed the meeting, David Abedon, said he hasn't read the full manuscript, but he favors a smaller expansion. (Ex. 1.) Abedon violated the prohibition against ex parte communications when he spoke to the press. His comments to the media are indeed troubling and should be discouraged. The Court recognizes that these comments were imprudent and risked giving the impression that *Page 85 
Abedon had a preconceived notion as to the facts of the case that might affect his ability to act fairly and impartially at the meeting of the full Council.
However, disqualification is a severe sanction, and the Court is reluctant to order disqualification based upon a single incident of improper ex parte communication. Abedon is entitled to a presumption of honesty and integrity because he did not participate in building an adversarial case against either party nor do his ex parte communications render the risk of unfairness intolerably high. See Kent County WaterAuth., 723 A.2d at 1137. No evidence exists that Abedon had a "personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his . . . impartiality seriously and to sway his . . . judgment." Ryan, 941 A.2d at 185.
Although no party has moved to disqualify either Sahagian or Ricci from participating in the application process, the Court feels it necessary to comment on the innuendo suggesting that they may have been biased. This Court found no evidence whatsoever to rebut the presumption of honesty and integrity on their part. No party presented any credible evidence suggesting that either of them had a "personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his . . . impartiality seriously and to sway his . . . judgment." Ryan, 941 A.2d at 185.
 G The Court's Remedy
Because CRMC considered the Goulet plan in violation of § 42-35-13, Champlin's substantial rights have been prejudiced. Section 42-35-15(g). The CRMC's decision was made upon unlawful procedure and in excess of CRMC's statutory authority. Section 42-35-15(g)(2)-(3); Section 42-35-13. Additionally, Champlin's substantial rights were violated because its *Page 86 
application was voted on by two CRMC members, Tikoian and Lemont, who were biased and prejudiced against them. See La Petite Auberge,Inc., 419 A.2d at 283-84 (stating that the Due Process Clause of theFourteenth Amendment entitles a person to an administrative tribunal that is not biased or indisposed to a fair and impartial decision). Their bias and prejudice infringed upon Champlin's constitutional rights. Section 42-35-15(g)(1); U.S. Const. amend. XIV, § 1.
The Court "may affirm the decision of the [CRMC] or remand the case for further proceedings, or it may reverse or modify the decision." Section 42-35-15(g). As the circuit court said in PATCO, "Since the principal concerns of the court are the integrity of the process and the fairness of the result, mechanical rules have little place in a judicial decision whether to vacate a voidable agency proceeding. Instead, any such decision must of necessity be an exercise of equitable discretion."PATCO, 685 F.2d at 564-65.
As noted above, the Rhode Island Supreme Court issued a decision that impacts on the issues pertinent to this matter. In re Request forAdvisory Opinion from the House of Representatives (Coastal ResourcesManagement Council), 961 A.2d 930 (R.I. 2008). The Supreme Court's decision effectively renders the current CRMC unconstitutional because it is made up of members appointed by the General Assembly, in addition to the Governor. See Section 46-23-2(a). The Supreme Court remarked however:
 [T]he constitutional impropriety of CRMC in exercising certain powers because of the method by which its members have been selected since 2004 should not affect the validity of CRMC's administrative actions and determinations to this date. The past acts of CRMC should be accorded de facto validity. Id. at 942 n. 18.
Our Supreme Court noted that the United States Supreme Court has declined "to provide retrospective remedies which would substantially disrupt governmental programs and functions." Id. (citing Lemon v.Kurtzman, 411 U.S. 192, 208-09 (1973) (plurality opinion)). TheLemon *Page 87 
plurality remarked, "[A]bsent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful."Lemon, 411 U.S. at 209.
This Court recognizes that the General Assembly will have to pass legislation to accommodate our Supreme Court's recent ruling. The legislative process could further delay a final decision on Champlin's application. Even once new legislation is in place, the Governor will have to appoint new members to CRMC, and they will have to obtain the advice and consent of the Senate. The appointment process clearly would further delay a final decision on Champlin's application and might call into question the twenty-three hearings, the validity of which has not been challenged. Unlike the circuit court in Antoniu, this Court is not inclined to remand this case to CRMC with instructions that Tikoian, Lemont, and Zarrella should be disqualified from further participation, with CRMC considering the application de novo. See Antoniu, 877 F.2d at 726. To do so would cause an unreasonable burden for the applicant who has already incurred enormous expense and who has encountered substantial delay in having its application determined.
The Court is guided by Sakonnet Rogers, Inc. v. Coastal ResourcesManagement Bd., 536 A.2d 893 (R.I. 1988). In Sakonnet Rogers, Inc., the Rhode Island Supreme Court found that CRMC had not based its decision on any of the relevant regulatory factors when it decided against a corporation's request to build a foundation on a coastal natural area.Id. at 897. The Supreme Court decided against a remand:
 To delay the administrative process further by remanding the case to CRMC for additional consideration of a petition filed seven years ago would prejudice the right of the petitioner to a final adjudication of his petition within a reasonable period. It is clear to us that since CRMC failed to deny the petition on the basis of any of the [regulatory] criteria, the petitioner is entitled to a *Page 88 
judgment in the Superior Court reversing CRMC's decision on its application." Id at 897; see also Ratcliffe v. Coastal Resources Management Council, 584 A.2d 1107, at 1111 (refusing to remand case for further consideration because right of property owners to a final adjudication within a reasonable period would be prejudiced).
The Court also finds Acierno v. Folsom, 337 A.2d 309 (Del. 1975) instructive. In Acierno, the chairperson of the Planning Board had acted as an adversary in an earlier appeal by an applicant seeking a subdivision approval. Id at 314-15. The Acierno Court determined that the chairperson should have disqualified himself, and his failure to due so violated the appellant's due process rights. Id at 316. The chairperson's refusal to disqualify himself resulted in a tie vote disapproving the applicant's subdivision plan. The Acierno Court decided to subtract the chairperson's vote, and the Board's vote was counted as 3-2, approving the subdivision plan. Id. at 317.
Like our Supreme Court in Sakonnet Rogers, Inc., this Court finds that remanding Champlin's application to CRMC would "prejudice the right of [Champlin's] to a final adjudication of [its] petition within a reasonable period." Sakonnet Rogers, Inc., 536 A.2d at 897. Champlin's filed its application in 2003, and given the General Assembly's need to enact a new CRMC statutory scheme, remand would ensure that Champlin's application would be "mired in a bureaucratic morass."Ratcliffe, 584 A.2d at 1110. Champlin's application has already been pending nearly as long as the seven years the corporation waited inSakonnet Rogers, Inc. Sakonnet Rogers, Inc., 536 A.2d at 897.
This Court finds that like Acierno, the votes of those who should have been disqualified from participating in the full Council vote — Tikoian, Lemont, and Zarrella — must be subtracted from the final vote.Acierno, 337 A.2d at 317. This Court notes that if Zarrella and Lemont had been disqualified from the Subcommittee vote, the Subcommittee Recommendation still would *Page 89 
have passed by a 2-0 vote. Section 46-23-20.1(e) provides, "The subcommittee shall consist of at least one member, provided, however, that in all contested cases an additional member shall be a resident of the coastal community affected." No party has challenged the manner in which the twenty-three hearings proceeded, and the Court finds no evidence that the participation of either Zarella or Lemont in those hearings tainted the evidentiary hearings.
Seven votes remain, which is sufficient for a quorum.[42] The Court upholds the decision of the full Council members supporting the Subcommittee Recommendation by a 4-3 vote. (See Findings of Fact of CRMC Members in Support of the Subcommittee Recommendation.) Sahagian, Ricci, Coia, and Shekarchi voted in the affirmative. (Findings of Fact of CRMC Members in Support of the Subcommittee Recommendation at 7; full Council Tr. at 200-01, 2/28/06.) Sullivan, Abedon, and Gray voted in the negative. (Full Council Decision at 13; full Council Tr. at 200-01, 2/28/06.) The decision of the full Council members supporting the Subcommittee Recommendation is supported by the reliable, probative, and substantial evidence of record.
 Conclusion
The appeal of the Town of New Shoreham is dismissed without prejudice.
The appeal of Champlin's Realty Associates is granted. . The decision of those members of the full Council voting against the Subcommittee Recommendation was made in violation of constitutional and statutory provisions, upon unlawful procedure, in excess of CRMC's statutory authority, and was not based on the reliable, probative, and substantial evidence in the Subcommittee record. Champlin's substantial rights have been prejudiced.
Tikoian, Lemont and Zarella engaged in prohibited ex parte communications and ceased *Page 90 
to function as impartial triers of fact, rebutting the presumption that a hearing officer acts with honesty and integrity. Champlin's substantial rights were violated because its application was voted on by three partial triers of fact, two of whom — Lemont and Tikoian — were biased and prejudiced against it.
In accordance with the recent Rhode Island Supreme Court decisionIn re Request for Advisory Opinion from the House of Representatives(Coastal Resources Management Council), 961 A.2d 930 (R.I. 2008), the current CRMC legislation does not comply with our Constitution. As such, the Court shall not remand this case for further proceedings consistent with this decision because to do so would result in unreasonable delay, substantially prejudicing the rights of Champlin's to have this matter resolved within a reasonable period of time. Furthermore, a remand at this juncture would be futile as there would be no adjudicatory body, constitutionally constituted in accordance with Article IX, section 5 of the Rhode Island Constitution, to hear the matter. As a result, such a remand would further prejudice the due process rights of Champlin's with additional delay and would render all the previous CRMC determinations and administrative actions — that our Supreme Court stated "should be accorded de facto validity," id. at 942 n. 18 — invalid. Accordingly, this Court finds that such a remand would constitute just the type of "retrospective remedy which would substantially disrupt governmental programs and functions" referenced with disapproval in our Supreme Court's advisory opinion. See id. (citing Lemon, 411 U.S. at 208-09).
After thorough review of the record, the Court finds that Tikoian, Lemont and Zarella should not have participated in the meeting of the full Council. The Court therefore reverses the decision of the full Council and finds that absent the participation of the disqualified members, the remaining members voted four to three in favor of the Subcommittee Recommendation. The *Page 91 
Court also finds that the findings of the Subcommittee in making its Recommendation were supported by the record of the twenty-three evidentiary hearings before it. Accordingly, the final CRMC decision — "Findings of Fact of CRMC Members in Support of the Subcommittee Recommendation" — is supported by the reliable, probative, and substantial evidence of record and is affirmed.
Counsel shall submit an appropriate order for entry.
[1] The New York Public Library Book of Twentieth-Century AmericanQuotations 130 (1992).
[2] Champlin's filed its original complaint on March 23, 2006 and filed an amended complaint on April 10, 2006.
[3] Those members are Michael Tikoian, chairperson of the CRMC; David Abedon, Paul E. Lemont, Jerry Sahagian, Raymond Coia, Neill Gray, N. Joseph Shekarchi, Thomas Ricci, Gerald P. Zarrella, and Michael Sullivan.
[4] 04 000 CRIR 011.
[5] 04 000 CRIR 010.
[6] The Court considers the question of whether an authorized agent of the Town need sign Champlin's application because the Town is the title owner of the Great Salt Pond to be answered in the negative byChamplin's Realty Associates, L.P. v. Tillson, 823 A.2d 1162, 1169 (R.I. 2003).
[7] CRMC Management Procedures are cited in this decision as they existed Dec. 17, 2004. See Ex. S.
[8] Section 46-23-20.4(a) provides, "After due consideration of the evidence and arguments, the hearing officer shall make written proposed findings of fact and proposed conclusions of law which shall be made public when submitted to the [full] Council for review." Section 46-23-20.4(a). The subcommittee acts in accordance with the rules and procedures governing hearing officers. See Section 46-23-20.1(e).
[9] Senator Susan Sosnowski was also appointed to serve on the Subcommittee, but she did not participate in its deliberations and recommendation.
[10] Section 3 of the CRMC's Management Procedures provides, "Only those subcommittee members who have attended all meetings of the subcommittee may vote on the subcommittee recommendation."
[11] Though Chair Tikoian considered himself an ex officio member of the Subcommittee, he testified that he did not attend all of the Subcommittee meetings and, as a result, was ineligible to vote with the Subcommittee. (Tr. at 77, 4/5.)
[12] Those members of the full Council, who voted against the Subcommittee Recommendation, made the same findings, though it determined that the "appropriate location and delineation of mooring field E should be that as approved and documented in the 1993 [Army Corps of Engineers] permit." (Full Council Decision ¶¶ 79-80 at 11.) These full Council findings served as the basis for the Town's appeal inTown of New Shoreham vs. The Coastal Resources Management Council of theState of Rhode Island, C.A. No. PC 06-3900.
[13] The Recommendation contained other conditions, including less obtrusive lighting, provision of a pump-out and launch facilities for all boats docked or moored in the Great Salt Pond, and payment by Champlin's of $50,000 over five years. (Subcommittee Recommendation at 6.)
[14] The CRMC also considered Champlin's Motion to Disqualify Tikoian and Abedon. Section 46-23-4 states, "A majority vote of those present shall be required for action."
[15] The Court will address the basis of these motions later in the decision.
[16] Section 46-23-4 states, "A majority vote of those present shall be required for action."
[17] "Compl." refers to Champlin's First Amended Complaint.
[18] Unless otherwise indicated, "Ex." refers to exhibits entered in evidence in the evidentiary hearings before this Court.
[19] Unless otherwise indicated, "Tr." refers to the transcript of the evidentiary hearings held before this Court.
[20] See Exs. Committee F, G, H, I, and J.
[21] Goulet testified that Ex. Committee M was the slide reflecting the Goulet plan, prepared prior to the Subcommittee workshop. (Tr. at 23, 3/26.) He also testified that Ex. Committee N, another slide, was a continuation of the Goulet plan representing New Shoreham's modified Mooring Field E. (Tr. at 26-27, 3/26.)
[22] Goulet cited his knowledge that the Town's requirement of at least one-hundred feet between moorings and commercial structures was designed with modest size boats, of thirty-five to fifty feet in length, in mind, as an example of his professional judgment. (Tr. at 99, 3/26.)
[23] The credible evidence suggests that although Tikoian and Lemont chose not to permit Goulet to show his plan to Zarrella prior to the workshop, they did contact Zarella and inform him of the existence of the plan.
[24] Tikoian claimed that he told Ricci that it would be nice if the Subcommittee could reach a compromise, but he denied mentioning a 100-foot extension or Sahagian's position on such an extension. (Tr. at 19, 4/5; Tr. at 60, 4/11.)
[25] Fugate explained that he refused to give Sahagian a copy of the plan because he felt it should be properly introduced before the Subcommittee or full Council. (Tr. at 57, 4/2.)
[26] Sahagian's term was due to expire on January 31, 2006. (Aff. of Jerry Sahagian ¶¶ 15-17.)
[27] Tikoian denied saying he backed Lemont 100 percent to Voskamp. (Tr. at 69, 4/5.)
[28] Adelman's deposition was taken as part of a federal court case,Champlin's Realty Associates v. Donald L. Carcieri, et al., C.A. No. 06-135 ML, U.S. District Court for the District of Rhode Island.
[29] The Court finds that in light of all of the facts and circumstances presented at the evidentiary hearing, including the timing of Tikoian's meeting with the Governor, the so-called "full plan" referenced by Adelman was actually the Subcommittee Recommendation.
[30] Zarrella testified that at certain times prior to the Subcommittee hearings, he kept his boat at Champlin's. (Tr. at 12-13, 3/20.)
[31] Donald Gomez and Bruce Dawson are CRMC members who were appointed after the full Council's February 28, 2006 vote on Champlin's application.
[32] With respect to the reception of additional evidence after the completion of the DEM adjudicatory hearing, the Administrative Rules of Practice and Procedure for the Administrative Adjudication Division for Environmental Matters provide: "No evidence shall be admitted after completion of a hearing or after a case submitted on the record, unless otherwise ordered by the AHO [Administrative Hearing Officer] or Director." 12 010 CRIR 001-20.
[33] The Goulet plan was never presented as evidence before the full Council, giving the parties an opportunity to confront it and cross-examine Goulet on his proposal.
[34] See also § 42-35-9: "(e) The record in a contested case shall include:. . . . (2) Evidence received or considered;. . . . (7) All staff memoranda or data submitted to the hearing officer or members of the agency in connection with their consideration of the case," and "(g) Findings of fact shall be based exclusively on the evidence and matters officially noticed."
[35] The General Assembly has required that ". . . any . . . governmental agency proposing any development or operation within, above, or beneath the tidal water below the mean high water mark, extending out to the extent of the state's jurisdiction in the territorial sea . . ." seek CRMC approval. See
Section 46-23-6(2)(ii)(A). In the exercise of these and other powers, the CRMC has promulgated the Coastal Resources Management Plan. Specifically, Section 300.15B of CRMP, governing municipal harbor regulations, requires that "[a]ll municipalities proposing to adopt harbor rules, regulations, or programs shall apply to the Council for a determination of consistency with the Coastal Resources Management Program." The CRMC has also promulgated the Guidelines for the Development of Municipal Harbor Management Plans to guide the HMP process. The result of a valid final Harbor Management Plan is to effect a delegation of the CRMC's statutory authority to regulate the coastal waters of the state to a local municipality which has had its HMP approved by the CRMC. "Upon approval, the CRMC shall issue a determination of consistency with the RICRMP and delegate primary management authority to the municipality for activities under the jurisdiction of the Final Harbor Management Plan . . ." and "[n]o separate application for activities subject to the jurisdiction of the Final Harbor Management Plan shall be made to the CRMC." Section (IV)(B) of Guidelines. Interim Harbor Management Plans effect a similar delegation of authority but, "[t]he CRMC shall reserve the right to refuse delegation of any activities it feels are inappropriate for municipal governance where these activities are subject to the regulatory authority of the state." Id. In addition to effecting a delegation to the municipality and consistent with the requirements of § 46-23-6(1)(v)(B)(III) ("The council shall administer its programs, regulations, and implementation activities in a manner consistent with special area management plans"),
 upon approval of the plan, any official of the state, municipality or any other political subdivision making regulatory decisions or undertaking or sponsoring development affecting the area within the jurisdiction of the plan shall, to the maximum extent practicable or allowable by law, make such decisions or conduct such activities consistently with the recommendations and requirements of the plan, unless such official shows cause to the CRMC why a different action should be taken, or that there exists an overriding public interest in pursuing such decisions or activity. Section (IV)(B) of Guidelines.
Finally, the Guidelines provide that "[a]ll Final Harbor Management Plans shall be reviewed by the CRMC every 5 years" and that "[a]ll changes to approved Final Harbor Management Plans, or elements thereof, shall be submitted to the CRMC for review and approval."Id.
[36] The Subcommittee Recommendation modified the expansion sought by Champlin's from 240 feet to 170 feet. The Court notes that in its brief, the Town focused on the expansion contained in the application, and not on the modified relief recommended by the Subcommittee. Although the Town failed to address the merits of the Recommendation as it relates to the Town's argument, in light of the Court's ruling that the HMP expired, this failure is moot.
[37] It is also noteworthy that even after delegation of decisional authority to a municipality pursuant to an HMP, the CRMC retains revisory authority over local decision making as well as the right to hear "why a different action should be taken, or that there exists an overriding public interest in pursuing such decisions or activity." Section (IV)(B) of Guidelines.
[38] Not all municipal ordinances relating to a municipality's harbor require CRMC approval. See Section 300.15(B)(2) of CRMP ("When a city or town enacts a police ordinance under R.I.G.L § 46-4-2, it shall not be required to request a determination of consistency with the Coastal Resources Management Program unless such bylaw or ordinance affects the planning, regulation, or coordinating functions of the Council.").
[39] States, including Illinois, Ohio, Alaska, Connecticut, and Minnesota, have also adopted the PATCO standard. See, eg., E EHauling, 451 N.E.2d at 572; State ex rel. Unger v. Indus. Comm.,640 N.E.2d 833, 835-36 (Ohio 1994); Municipality of Anchorage v.Carter, 818 P.2d 661, 666 n. 13 (Alaska 1991); Martone v. Lensink,541 A.2d 488, 493 (Conn. 1988); Northern States Power Co. v. Minnesota Pub.Utils. Comm'n, 414 N.W.2d 383, 386 (Minn. 1987).
[40] Our Supreme Court also explained that bias or prejudice need not stem from an extra judicial source:
 It is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that `extrajudicial source' is the only basis for establishing disqualifying bias or prejudice. It is the only common basis, but not the exclusive one, since it is not the exclusive reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as `bias' or `prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment. Ryan, 941 A.2d at 185, n. 21 (quoting Liteky v. U.S., 510 U.S. 540, 551 (1994)).
[41] Champlin's also moves to disqualify Donald Gomez and Bruce Dawson, but such motions are moot based upon the ruling in this case.
[42] Section 46-23-4 states, "A quorum shall consist of seven (7) members of the council."